1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
2                   CENTRAL DIVISION LEXINGTON

3
    UNITED STATES OF AMERICA,
4
         Plaintiff,              Docket No. 5:25-CR-73
5                                At Lexington, Kentucky
                                 Tuesday, May 27, 2025
6                                2:05:42 p.m.

7   QUINCINO LAMONT WAIDE, JR.,    *Via Electronic Recording*

8         Defendant.

9                          - - -
         TRANSCRIPT OF PRELIMINARY HEARING AND DETENTION
10   HEARING PROCEEDINGS BEFORE UNITED STATES MAGISTRATE
                  JUDGE MATTHEW A. STINNETT
11      Tape#KYED-LEX_5-25-mj-5253-MAS_20250521_110720
                           - - -
12
    APPEARANCES:
13
    For the United          MARY LAUREN MELTON
14   States:                Assistant United States Attorney
                            260 West Vine Street
15                          Suite 300
                            Lexington, Kentucky  40507-1612
16                          (859) 685-4802

17
    For the Defendant       WHITNEY TRUE LAWSON
18   Waide:                 True Guarnieri Ayer, LLP
                            124 Clinton Street
19                          Frankfort, Kentucky  40601
                            (502) 605-9900
20
    Transcriber:            SANDRA L. WILDER, RMR, CRR
21                          Official Court Reporter
                            313 John C. Watts Federal Building
22                          330 West Broadway, Suite 327
                            Frankfort, Kentucky  40601
23                          (859) 516-4114

24
         *Proceedings recorded digitally, transcript produced
25   by transcriber.*

1              *(Proceedings commenced in open court at*
2  *2:05:42 p.m.)*
3              THE COURT:  Thank you, sir.
4        Madam Clerk, please call the 2:00 matter.
5              COURTROOM DEPUTY:  Yes, Your Honor.
6        Lexington Magistrate Case Number 25—5253, United States
7  of America versus Quincino Lamont Waide, Jr., called for
8  preliminary hearing and detention hearing.
9              THE COURT:  Thank you, ma'am.
10       Counsel, please state their appearance.
11       Ms. Melton.
12             MS. MELTON:  Yes, Your Honor.  Good afternoon.
13  Mary Melton on behalf of the United States.
14             THE COURT:  Thank you.
15       Ms. Lawson.
16             MS. LAWSON:  Whitney Lawson on behalf of the
17  defendant Mr. Waide, who's present and seated to my right.
18             THE COURT:  All right.  Thank you.
19       And good afternoon to you, Mr. Waide.
20             THE DEFENDANT:  Good afternoon.
21             THE COURT:  So, Counsel, as the courtroom deputy
22  just indicated, we are here for the preliminary hearing and
23  detention hearing.
24       Of course, on the preliminary hearing side, the burden
25  is on the government to establish probable cause the

1    allegation here at issue.

2        If counsel during the preliminary hearing wish to

3    address any facts relevant to the pretrial custody issues,

4    certainly feel free to do so.

5        If you'd like to hold off on those as part of the

6    detention hearing itself, to the extent we get there, we'll

7    certainly do that as well.

8        Ms. Melton, is the United States prepared to move

9    forward on the preliminary hearing?

10             MS. MELTON:  Yes, Your Honor.

11             THE COURT:  Ms. Lawson, Mr. Waide?

12             MS. LAWSON:  Judge, we have one witness, his mom,

13   that I think is present in the courtroom for the

14   detention -- for the preliminary --

15             THE COURT:  For the detention -- for the

16   preliminary hearing?

17             MS. LAWSON:  Yes.

18             THE COURT:  Okay.  And are you prepared to move

19   forward with that as well?

20             MS. LAWSON:  Yes.

21             THE COURT:  All right, then.

22       Again, given the burden rests on the United States,

23   Ms. Melton, witnesses or a proffer of fact on the issue of

24   probable cause.

25             MS. MELTON:  Special Agent Robison, Your Honor.

```
 1        And we will probably go ahead and just put on the facts
 2   related to his detention, if it's okay with the Court and
 3   counsel.
 4            THE COURT:  Certainly.
 5        Any issue as to separation of witnesses?  Anybody?  No?
 6   Anybody care?  No.  All right.
 7        Special Agent Robison.
 8            (The Witness Isaac Robison was sworn.)
 9            THE COURT:  Special Agent Robison, once you get
10   settled there, could you state your name for the record, and
11   spell your last name.
12            THE DEFENDANT:  Isaac Robison, R-O-B-I-S-O-N.
13            THE COURT:  Thank you, sir.
14        Ms. Melton.
15            MS. MELTON:  Thank you, Your Honor.
16                        Government's Case
17                        DIRECT EXAMINATION
18   BY:  MS. MELTON:
19   Q.    Special Agent Robison, how are you employed, sir?
20   A.    I am a special agent with the FBI.
21   Q.    What are your duties as a special agent with the
22   FBI?
23   A.    I am assigned to investigate crimes of violence and
24   gang activity.
25   Q.    With respect to gang activity, are there any gangs
```

1  that you've investigated that are going to be relevant to

2  our discussion today?

3  A.      The Hot Boyz.

4  Q.      All right.  Tell us about the Hot Boyz.

5  A.      The Hot Boyz are a street gang here in Lexington.

6  They've self-identified themselves as approximately eight

7  members.  Those eight members have been involved in numerous

8  acts of violence to include shootings, homicides, robberies,

9  things of that nature, over the last several years.

10 Q.      And who are those eight members of the Hot Boyz?

11 A.      So those self-identified members are Da'Quis Sharp,

12 Jatiece Parks, William Dixon, Desmond Bellomy, Quincino

13 Waide, Jr., Chance Gist, and DeAngalo Boone.

14 Q.      I'm going to place a proposed exhibit up on your

15 screen, Special Agent Robison.  Can you tell me if you see

16 it?

17 A.      I do.

18 Q.      All right.  Do you recognize these items?

19 A.      I do.

20 Q.      What are they?

21 A.      They are two different pictures that were posted by

22 William Dixon on his Instagram page.

23 Q.      And how did law enforcement get ahold of these

24 pictures?

25 A.      Lexington Police Department served a search warrant

1  on William Dixon's Instagram and received the items in that

2  way.

3  Q.      When approximately were these pictures taken?

4  A.      The picture on the left was posted on October 2,

5  2023, and the picture on the right was posted on September

6  16, 2023.

7          MS. MELTON:  All right.  Your Honor, the

8  government moves to admit Government Exhibit 1.

9          THE COURT:  Any objection?

10          MS. LAWSON:  No objection, Your Honor.

11          THE COURT:  So admitted.

12  Q.      All right, Special Agent Robison, starting with the

13  picture on the left, what are we looking at here, like,

14  what's the significance of this picture to you as an

15  investigator?

16  A.      So the picture on the left, you have the six people

17  here in the picture; I'll go from the top left and go across

18  the top.  That is Chance Gist, Quincino Waide, William

19  Dixon, Da'Quis Sharp.  And then on the bottom, that is

20  Jatiece Parks and Desmond Bellomy.

21      As you can see, multiple -- the people in the photo,

22  all of them are holding up various gang hand signs, some of

23  which are gesturing hand signs to promote the Hot Boyz.

24      Others are doing hand signs to disrespect rival gangs,

25  specifically 530 or EBK.  And then also holding up mimicking

1  a gun or a hand sign for a gun to disrespect the rival

2  gangs.

3  Q.     You noted Mr. Waide was in this picture.  Are you

4  able to tell us what hand sign specifically that he's

5  holding up?

6  A.     Mr. Waide appears to be disrespecting a rival gang,

7  putting the hand sign down and then mimicking holding a gun.

8  Q.     All right.  How about the picture over on the right;

9  tell us what we're seeing here.

10 A.     The picture on the right again was posted by

11 Mr. William Dixon.  He captioned the picture, "It's only

12 eight of us," referring to the eight members of the Hot

13 Boyz.

14       And then on the bottom he says, "Four and a spade,"

15 referring to a former member of their gang that was killed

16 in 2020.  And in that picture, again, you can see Mr. Waide

17 on the far left dressed in all black.

18 Q.     And what is Mr. Waide doing with his hands there?

19 A.     He appears to be gesturing as if he was holding a

20 gun.

21 Q.     So how do we know that these individuals are part of

22 a gang as opposed to simply being friends or associates?

23 A.     As you can see in the pictures, they're all holding

24 up hand signs consistent with gang activity, gang

25 affiliation.

1        In other postings and pictures, they will all post

2   different things such as the spade was a common thing that

3   they used.

4        In other pictures, Mr. Sharp has on his shoes the words

5   "Hot Boyz."  They have posted music videos and different

6   things of that nature all claiming Hot Boyz.

7   Q.      All right.  And why have the Hot Boyz been on law

8   enforcement's radar?

9   A.      They have been on law enforcement's radar for

10  several years due to violent acts such as shootings,

11  homicides, robberies, narcotics trafficking, things of those

12  nature.

13  Q.      A moment ago you mentioned a couple of rival gangs;

14  you said "EBK" and "530".  Those gangs primarily are

15  associated with the East End; is that correct?

16  A.      That is correct.  The Hot Boyz are traditionally --

17  were normally associated with the West End, and EBK or 530

18  is traditionally associated with the East End.

19  Q.      So what events, if any, were important to the

20  escalation of violence between the Hot Boyz and these East

21  End gangs?

22  A.      There were a few things that escalated the violence

23  between these two groups.  The first one, I would say, was

24  the death of Ja'Quis Ray.  He was murdered on December 28,

25  2020.  Ja'Quis Ray went by "Pooda."  He was the brother of

1   Da'Quis Sharp and Jatiece Parks, and he was also very close

2   with the other members of the Hot Boyz.

3        And then the second incident would be when Eric Boone

4   was murdered on May 17, 2022.  That is the father of Da'Quis

5   Sharp.

6   Q.      And then how about on the other side of things, any

7   acts that are attributable to the Hot Boyz that escalated

8   violence between the two groups?

9   A.      Yeah.  In -- on August 27, 2023, Malik Sleet was

10  killed, and the primary suspects were members of the

11  Hot Boyz.

12  Q.      The name Malik Sleet, that last name, what is the

13  significance of Sleet or the Sleet family in all of this?

14  A.      The Sleets are a prominent family within the EBK or

15  530 group and have had significant issues with members of

16  the Hot Boyz over the last few years.

17  Q.      Have any other members of the Sleet family perished

18  other than Malik Sleet?

19  A.      Jadyn Sleet was also killed on October 24, 2024.

20  Q.      All right.  I'm going to place another proposed

21  exhibit up on your screen, Special Agent Robison.  Just let

22  me know when you've had a chance to look over that.

23  A.      Yes, I can see it.

24  Q.      All right.  Do you recognize that?

25  A.      I do.

```
 1  Q.      And what is it?

 2  A.      It is the obituary for Ja'Quis Ray.

 3  Q.      Where did this come from?

 4  A.      From O. L. Hughes & Sons Mortuary, their website.

 5          MS. MELTON:  All right.  The government moves to

 6  admit Government Exhibit 2, Your Honor.

 7              THE COURT:  Any objection?

 8              MS. LAWSON:  No objection, Your Honor.

 9              THE COURT:  So admitted.

10  Q.      All right.  So as someone with knowledge about the

11  Hot Boyz and these East End gangs, what stands out to you

12  about this obituary?

13  A.      Primarily that it notes that he -- that his brothers

14  were Da'Quis Sharp and Jatiece Parks, and that also that his

15  best friend was Mr. Quincino Waide who goes by Freddie.

16  Q.      And that's there in the last line, correct, it said,

17  "And friends, including childhood best friend Quincino

18  Freddie Waide?"

19  A.      That is correct.

20  Q.      So what incidents, if any, between the West End and

21  East End groups has Mr. Waide been involved in?

22  A.      There was a homicide on March 28, 2020, in which an

23  individual named Zion Clark was murdered, as well as a

24  shooting that took place on October 26, 2024.

25  Q.      So starting with the March 2020 shooting, tell us
```

1  about that.

2  A.      On March 29, 2020, Lexington Police Department

3  responded to 514 East Second Street here in Lexington for a

4  report of shots fired in the area.

5       When police arrived on scene, there were three male

6  victims with gunshot wounds, one of which was Mr. Zion

7  Clark, who appeared to be deceased when police arrived on

8  scene.  The other two victims were Mr. Quincino Waide, Jr.,

9  and also an Alec Wait.

10  Q.      Was there anything notable about Mr. Waide's

11  statements to police or the statements of other witnesses

12  related to that shooting?

13  A.      One of the witnesses that spoke to police on scene

14  mentioned that she lived nearby and referred to Mr. Waide as

15  Freddie, and said that Freddie had told her that he knew who

16  had --

17            MS. LAWSON:  Judge, I'll object to the hearsay.

18            MS. MELTON:  It's a preliminary and detention

19  hearing, Your Honor; hearsay is admissible.

20            THE COURT:  And I appreciate the objection,

21  Ms. Lawson.  I'll overrule it, but I understand your point.

22       Go ahead, Mr. Robison.

23  A.      She mentioned that Mr. Waide had told her that he

24  knew who had done the shooting and that they would get them

25  back.  But then when Mr. Waide was questioned by law

1  enforcement, he refused to cooperate.

2  Q.     All right.  And we're going to discuss that October

3  2024 shooting in a lot more detail here in a little while,

4  but for the moment, can you just give us an overview of that

5  incident.

6  A.     Yes.  On October 26, 2024, a silver vehicle came to

7  a stop light on Palumbo Drive and Old Todd's Road here in

8  Lexington, and as soon as they stopped, four masked

9  individuals exited the vehicle with firearms and began

10 shooting at a dark-colored Chevrolet Cruze.  The Chevrolet

11 Cruze immediately exited the area and the four individuals

12 returned to the silver car and followed it all the way on to

13 Patchen Drive where shots continued to be fired between the

14 two vehicles, until a single male occupant from the dark

15 Chevrolet Cruze exited and abandoned the vehicle.

16 Q.     And which vehicle do we think Mr. Waide was in

17 during that incident?

18 A.     The Chevrolet Cruze.

19 Q.     So what evidence, if any, do we have showing that

20 Mr. Waide is a willing participant in all of this

21 East End/West End gang violence?

22 A.     Examples such as the pictures that we showed at the

23 beginning displaying hand signs, displaying -- to either

24 represent your own gang or disrespect rival gangs, as well

25 as different messages that have been recovered through

1  search warrants and things of that nature, and YouTube

2  videos of songs where they are promoting violence, promoting

3  their gang, and other things of that nature.

4  Q.      I'm going to put another proposed exhibit up on your

5  screen as being premarked as Government Exhibit 3.  It's got

6  a couple different pages, so let me know if you'd like me to

7  switch to the next one before we talk about it.

8  A.      I can see it, and we can start here.

9  Q.      Okay.  What is this?

10  A.      This was part of a search warrant that was done and

11  it is part of a -- messages that were received over

12  Snapchat.

13  Q.      Okay.  And from whose device or Snapchat account did

14  these messages come from?

15  A.      Marvelous Davis.

16  Q.      In this conversation, which of these two parties is

17  Mr. Marvelous Davis?

18  A.      Spanky Johnson 60.

19  Q.      Okay.  And if I remember correctly, Mr. Davis is

20  also a member or close associate of Hot Boyz, correct?

21  A.      He is an associate of the Hot Boyz, yes.

22  Q.      Okay.  And then what is the other username that

23  we've got here?

24  A.      Freddie Self-paid.

25  Q.      Have you reviewed this entire conversation?

1  A.      I have.

2  Q.      Other than, you know, the reference to the name

3  Freddie, what makes you think that this is Mr. Waide

4  participating in this conversation?

5  A.      They reference another person.  They were talking

6  about who has ties to the East End and referred to that

7  person as living close to Freddie, and at the time where

8  Mr. Waide was living was close by to this person that they

9  were referring to from the East End.

10             MS. MELTON:  Your Honor, we move to admit

11 Government Exhibit 3.

12             THE COURT:  Any objection?

13             MS. LAWSON:  No objection, Your Honor.

14             THE COURT:  So admitted.

15 Q.      Okay.  So we've already talked about the

16 participants in this conversation.  Who is this person in

17 the picture that has the text at the bottom?  And the

18 picture's kind of split in half as a result of the .pdf

19 document, correct?

20 A.      Correct.  So that is Mr. Malik Sleet.

21 Q.      Okay.  And you noted that he was murdered and that

22 the Hot Boyz are the primary suspects in that murder,

23 correct?

24 A.      That is correct.

25 Q.      Do you know who posted this picture of Malik Sleet

1  and what their purpose was in posting it?

2  A.      The person that posted that picture was a close

3  friend of Mr. Malik Sleet and a known associate of members

4  from the East Side gang such as EBK.

5  Q.      And so what does Marvelous Davis or Spanky Johnson

6  say about this individual?

7      I'll switch to the next page, I'm sorry.

8  A.      He initially says that, you know, this person lives

9  close to you, referring to where Freddie was living at the

10 time, and Freddie confirms that he knows who it is.  And

11 then he says, quoting, "He called bro and was like tell

12 Marvo I didn't have nothing to do with none of that, then

13 posts some of this shit like this."

14     And Freddie says, "Bro, he said, the same thing 'bout

15 me like what, then he acting like he had a factor or

16 something."

17 Q.      What do you think they're talking about there?

18 A.      So the time period of this is shortly after the

19 shooting on October 26, 2024, and -- that I was describing

20 earlier where a silver sedan was shooting at Mr. Waide.  So

21 we believe that they were referring to -- that this person

22 was trying to make sure that the Hot Boyz knew that he had

23 nothing to do with that shooting in which they're attempting

24 to kill Mr. Waide.

25     I believe that he was wanting to make sure that the Hot

1  Boyz knew that because of the Hot Boyz' reputation to

2  attempt to kill or shoot anybody that they believe would try

3  to attack them.  So I think that's what this was an attempt

4  to do, was just simply distance himself from that event.

5  Q.      And then as the conversation continues, Mr. Davis

6  calls this individual who posted the picture of Malik Sleet

7  a "pussy ass N-word," correct?

8  A.      That is correct.

9  Q.      And you already told us what Mr. Waide said next,

10 which is that this person is trying to act like he is a

11 factor or something.  Where does the conversation go from

12 there?

13 A.      Ultimately, Mr. Waide says that he is mad because he

14 quote, "Got all them dead N-words."

15 Q.      Referring to the person who posted the picture of

16 Malik Sleet, correct?

17 A.      Correct.

18 Q.      So you mentioned a music video before.  Can you tell

19 us a little more about that.

20 A.      Yes.  There was a music video that was posted on

21 November 10, 2023.  The name of the video is called "Hats,"

22 and it was posted by an HB Bobba or Hot Boyz Bobba on

23 YouTube.

24 Q.      What is "Hats" a reference to?

25 A.      "Hats" is slang for bodies or murders, and so the

entirety of the video is to describe murders that have taken

place.  Everybody in the video are all members or associates

of the Hot Boyz.

        Throughout the video they're displaying gang hand

signs, displaying firearms, and the lyrics of the song is,

"I have bodies like trophies, and that if you don't like

what they have to say, then you can go dig your brother up."

I believe that's a reference specifically to the Sleets,

that their brother had just been murdered a few months prior

to the posting of this video, referencing that if they had

an issue with what they were saying, that the Sleets could

go dig up their brother that they had just killed.

        Throughout the video I believe I mentioned that they

are all displaying hand signs that are all associates or

members of the Hot Boyz gang.

Q.      Any other criminal activity displayed in the video,

drugs, firearms?

A.      They display firearms throughout the video, and they

appear to be smoking.  It's unclear what.

Q.      Gotcha'.  Is Mr. Waide in that video?

A.      I believe he is in that video, yes.

Q.      And why do you believe he's in that video?

A.      There is one individual throughout the video that

does not show his face; he has a mask on the entirety of the

video and has sunglasses on.

1       But there is one portion of the video where he takes

2   sunglasses off, and you can see his eyes as well as his

3   hands are raised, and you can see the bottom portion of a

4   tattoo on his left harm.  I believe that tattoo is

5   consistent with Mr. Waide's tattoo as well as the eyes to be

6   consistent with Mr. Waide.

7   Q.      Have you had an opportunity to observe Mr. Waide's

8   tattoos?

9   A.      I have.

10  Q.      Okay.  I'm going to show you what's been premarked

11  as Government Exhibit 4.  What is this?

12  A.      That is a screen capture from the video of "Hats."

13  Q.      And who do you believe is portrayed here?

14  A.      I believe that to be Mr. Quincino Waide in the

15  middle there with the mask.

16  Q.      And we can see there the tattoo that you are

17  referencing on his left harm, correct?

18  A.      That is correct.

19          MS. MELTON:  Your Honor, the government moves to

20  admit Government Exhibit 4.

21          THE COURT:  Any objection?

22          MS. LAWSON:  No objection, Your Honor.

23          THE COURT:  So admitted.

24  Q.      So moving on, tell us about Mr. Waide's conviction

25  for a misdemeanor crime of domestic violence.

A.      On February 26, 2022, police officers responded to
1317 Centre Parkway Apartment 11 -- A11 to reports of
potential domestic violence.

When they arrived, they spoke with the victim, who is
the mother of two of Mr. Waide's children.  She told police
that Mr. Waide had been at her apartment, they got into an
argument, and Mr. Waide struck her, and then began to
strangle her while she was holding one of their children.

And then before he left, he struck her again, knocked
her to the ground while she was holding the child, and they
believed that the child hit their head as well.

Q.      Other than this person's word, did law enforcement
see any evidence corroborating that those events indeed
occurred?

A.      Law enforcement took photos of the injuries of the
victim.

Q.      Did that incident result in a conviction?

A.      It did.

Q.      For what charges?

A.      He was convicted of assault, fourth, intimidating a
witness, and trafficking in marijuana.

Q.      When was Mr. Waide convicted?

A.      The conviction took place in March 2023, in which he
was placed on two years probation, from March 2023, until
March 2025.

1  Q.      So you mentioned earlier an incident that occurred

2  in October 2024.  Was there anything significant in the

3  whole East End/West End dispute that occurred in the lead-up

4  to that October 2024 shooting?

5  A.      Yes.  So the shooting took place on October 26,

6  2024, and two days previous to this on the 24th, Mr. Jadyn

7  Sleet was murdered.

8  Q.      Okay.  So let's talk more about the shooting itself,

9  the one that you mentioned before involving the Chevy Cruze.

10  How did law enforcement learn about that shooting?

11  A.      Lexington Police Department received reports that

12  there had been shots fired in the area of Palumbo Drive and

13  Old Todd's Road in Lexington just after 4 p.m. in the

14  afternoon.

15      While police were responding to that area for the shots

16  fired calls, they received more calls that there were

17  further shots fired on Patchen Drive, and then they --

18  through further investigation, police realized that this was

19  the same event; it was just a continuation of the event.

20      So what police were able to understand that happened is

21  that a silver sedan, later discovered to be a silver Lexus,

22  came to the stop light at Old Todd's and Palumbo, four

23  masked individuals exited the vehicle and began shooting a

24  dark-colored Chevrolet Cruze.  The Chevrolet Cruze left the

25  area at high rate of speed, the four individuals re-entered

the silver sedan and began following the Cruze.

While they were following on Patchen Drive, witnesses described an individual hanging out of the back seat of the silver sedan and shooting a large-powered rifle at the Chevrolet Cruze, at which time witnesses described the individual driving the Chevrolet Cruze shooting or returning fire back at the silver sedan until the Chevrolet Cruze was unable to drive any further because three of the tires had been, had been shot out.

The vehicle was abandoned at -- on Patchen Drive near Lutheran School of Lexington, and witnesses described a male black exited the Chevrolet Cruze, one person with long dreadlocks, and that was the only apparent passenger of the vehicle.

Q.    I am going to put a thumbnail up of what's been premarked as Government Exhibit 5.  Do you recognize that?

A.    I do.

Q.    What is it?

A.    Lexington Police Department was able to obtain dash camera from a civilian who was close by when the, when the shots were fired on Palumbo and Old Todd's.

Q.    There is some music in this video.  That music is native to the vehicle that captured this, correct?  We did not add it for dramatic effect?

A.    That is correct.  And you also hear someone

1    speaking, and that is civilian that provided the video.

2            MS. MELTON:  Okay.

3        Your Honor, the Government moves to admit Government

4    Exhibit Number 5.

5            THE COURT:  Any objection?

6            MS. LAWSON:  No objection, Your Honor.

7            THE COURT:  So admitted.

8            *(Playing video recording of Government's Exhibit*

9    *Number 5.)*

10   Q.      So there we saw what you described, the four masked

11   vehicles (sic) getting out of the silver sedan and shooting

12   at the vehicle in front of them.

13       We saw some vehicles there on the left.  Were there any

14   other vehicles between the silver sedan and the Cruze at

15   that time?

16   A.      Yes, there was one other vehicle.

17   Q.      Directly in between them?

18   A.      Yes.

19   Q.      Was anyone harmed in that vehicle?

20   A.      No, not to my knowledge.

21   Q.      And were there any other civilian video cameras that

22   captured footage of that incident that day?

23   A.      The bus that you can see in this video currently

24   that's on the other side of the road, that bus also had

25   video footage that's been collected and reviewed.

1  Q.      How about as the incident proceeded to Patchen

2  Drive?

3  A.      As the incident proceeded to Patchen Drive, police

4  canvassed the area for any doorbell cameras that may have

5  caught any of the incident, and they were able to collect at

6  least two.

7  Q.      I'm going to show you a thumbnail for proposed

8  Government Exhibit 6.  Do you recognize that?

9  A.      Yes.

10 Q.      What is it?

11 A.      That is one of the doorbell cameras that Lexington

12 Police Department was able to collect that caught some of

13 the incident.

14         MS. MELTON:  Your Honor, the Government would move

15 to admit Government Exhibit 6 and publish it.

16         THE COURT:  Any objection?

17         MS. LAWSON:  No objection, Your Honor.

18         THE COURT:  So admitted.

19         (Playing video recording of Government's Exhibit

20 Number 6.)

21 Q.      Were those the first gunshots we heard just now?

22 A.      Yes.

23         (Playing video recording of Government's Exhibit

24 Number 6.)

25 Q.      And there at the end of the video, we saw both the

1  dark-colored sedan and the silver sedan leaving at a high

2  rate of speed down the residential street; is that right?

3  A.      That's correct.

4  Q.      Okay.  I've got another thumbnail for what will

5  hopefully be Government Exhibit 7.  Do you recognize that?

6  A.      I do.

7  Q.      What is it?

8  A.      This is another doorbell camera that was recovered

9  by Lexington Police Department that caught a portion of the

10  incident.

11          MS. MELTON:  All right.  Your Honor, the

12  Government moves to admit Exhibit 7 and publish it.

13          THE COURT:  Any objection?

14          MS. LAWSON:  No objection, Your Honor.

15          THE COURT:  So admitted.

16          (Playing video recording of Government's Exhibit

17  Number 7.)

18  Q.      So I think it's pretty clear from the Halloween

19  decorations, but this was a residential area, correct?

20  A.      That is correct.

21  Q.      Now, at the end of that video we're seeing that the

22  sedan is still pursuing the Cruze at that point, correct?

23  A.      That is correct.

24  Q.      You noted before that the pursuit eventually stopped

25  because the tires on the Cruze had been shot out; is that

1  right?

2  A.      That is correct.

3  Q.      Tell us what happened after that.

4  A.      According to witnesses, the vehicle was abandoned

5  and a single male passenger with long dreadlocks, a black

6  male exited the vehicle and fled on foot.

7  Q.      So did law enforcement locate that vehicle?

8  A.      Law enforcement did locate the vehicle.

9  Q.      And then what, if anything, did law enforcement

10 locate linking that dark-colored sedan to Mr. Waide?

11 A.      A couple of different things.  First, the vehicle

12 was registered to Ms. Markeisha Ragland who is the aunt of

13 Mr. Quincino Waide.  Ms. Ragland has been the registered

14 owner of multiple of the vehicles law enforcement is known

15 to -- has known that Mr. Waide has operated.

16      Prior to this incident, law enforcement was aware that

17 Mr. Waide was driving a gold Honda Accord that was also

18 registered in Ms. Ragland's name.  And then after this

19 incident when Mr. Waide was encountered and arrested by

20 Richmond Police Department, he had another Chevy Malibu that

21 was also registered in Ms. Ragland's name.

22      When law enforcement searched the Chevrolet Cruze, they

23 found multiple documents in the vehicle, medical documents

24 with Mr. Waide's name on them.

25 Q.      All right.  We heard a lot of gunfire.  Were shell

1  casings collected from the scenes, from vehicles, both?

2  A.      Shell casings were able to be collected at the

3  intersection of Old Todd's and Palumbo, and then they were

4  also collected all along Patchen Drive, and there were

5  various caliber of shell casings collected.

6  Q.      How about in the dark-colored sedan, any shell

7  casings inside the vehicle?

8  A.      There were three shell casings that were collected

9  inside the Chevrolet Cruze.

10  Q.      We'll talk more about those shell casings here in a

11  moment.  But first, what, if anything, did law enforcement

12  learn about the other vehicle that was involved, the silver

13  sedan?

14  A.      The silver sedan was ultimately located off Honey

15  Jay Court and was also searched and found multiple shell

16  casings inside that vehicle as well.

17  Q.      Who did that vehicle belong to?

18  A.      That vehicle --

19  Q.      Well, who was associated with it might be a better

20  question?

21  A.      When searching that vehicle, they did recover a palm

22  print on that vehicle from a Mr. Darrell Morbley, who has

23  sons that are involved in EBK and other East Side gangs.

24  Q.      Okay.  You mentioned some shell casings that were

25  collected from the Cruze a moment ago.  What analysis, if

1  any, did law enforcement perform on those shell casings?

2  A.      Law enforcement collected all the shell casings

3  involved in this incident, including the three inside the

4  Chevrolet Cruze, and performed what's called NIBIN testing

5  on the shell casings.

6  Q.      All right.  Mr. Waide was still on probation at the

7  time of this incident; is that correct?

8  A.      That is correct.

9  Q.      Was there another occasion which law enforcement

10 found Mr. Waide to be in possession of a firearm?

11 A.      Yes.  On April 24, 2025, Richmond Police Department

12 were contacted and were asked to assist the Lexington Police

13 Department in the execution of a search warrant.

14      Lexington Police Department had obtained a search

15 warrant for Mr. Quincino Waide's phone in relation to

16 Mr. Waide's involvement in this shooting, as well as

17 Mr. Waide's potential involvement in the homicide of

18 Kristopher Lewis.

19      They obtained that search warrant, but because of

20 Mr. Waide's residence in Richmond, they requested Richmond

21 Police Department to help them in the execution of that

22 warrant.

23      When law enforcement sat on the location where

24 Mr. Waide was living performing surveillance, they saw

25 Mr. Waide exit the residence walking his dog.

1   When Richmond Police Department exited their vehicles

2 and identified themselves and called to Mr. Waide, he fled

3 from them back into the house.  And as he fled into the

4 house, Richmond police officers noted that he appeared to

5 support something on his waistband, heavy, that would be

6 consistent with a firearm.

7 Q.  What happened after Mr. Waide ran away; where did he

8 go?

9 A.  Mr. Waide fled back into his residence, and Richmond

10 Police Department surrounded the residence and continued to

11 call him out.

12   Mr. Waide was barricaded inside the residence for

13 approximately 25 minutes before he, himself came out as long

14 (sic) as the other occupant of the house, Ms. Sierra Lang.

15 Q.  When Mr. Waide and Ms. Lang eventually exited the

16 residence, did either of them say anything to law

17 enforcement?

18 A.  Ms. Lang made statements to law enforcement that

19 there was a firearm inside.  Ms. Lang said that it was her

20 firearm, and that it was located in one of the children's

21 bedrooms and that it was hidden.

22 Q.  Why was it hidden?

23 A.  Ms. Lang said to hide from the children.

24 Q.  But you said that it was in one of the children's

25 bedrooms; is that right?

 1  A.       That is correct.

 2  Q.       So what did law enforcement do next?

 3  A.       Richmond Police Department obtained a search warrant

 4  for the residence, and then the residence was searched.

 5       During the search of the residence, a firearm was

 6  located inside one of the children's bedrooms.  It was in a

 7  floor vent.  And that firearm was recovered, as well as

 8  multiple boxes of ammunition throughout the house, a

 9  magazine in one of the bedrooms, as well as Mr. Waide's

10  phone was located in his bedroom as well.

11  Q.       The magazine that you mentioned, was it loaded?

12  A.       Yes, it was.

13  Q.       Was it in the firearm or separated from the firearm

14  when it was found?

15  A.       That magazine was separated from the firearm.  There

16  was no firearm associated with it.

17  Q.       Okay.  You also mentioned that they found

18  Mr. Waide's phone, so does that mean that law enforcement

19  was able to do forensic analysis on that phone?

20  A.       That phone had been wiped or factory reset.

21  Q.       You mentioned the location of where the firearm was

22  found.  I'm going to show you what's been premarked as

23  Government Exhibit 8.  Do you recognize that?

24  A.       Yes.

25  Q.       What is it?

1   A.      These are photos that were taken by the search team

2   when Mr. Waide's residence was searched.  It includes the

3   location of the firearm that was recovered.

4   Q.      And was it Richmond Police Department who took these

5   photographs and found the firearm?

6   A.      Yes.

7           MS. MELTON:  The Government moves to admit

8   Government Exhibit 8, Your Honor.

9           THE COURT:  Any objection?

10          MS. LAWSON:  No objection, Your Honor.

11          THE COURT:  So admitted.

12  Q.      And you mentioned earlier that, you know, this was

13  found in the children's bedroom in an HVAC vent.  This is a

14  floor-level HVAC vent, correct?

15  A.      That is correct.

16  Q.      When law enforcement first arrived into the room,

17  was there any heavy furniture or anything covering up that

18  HVAC vent?

19  A.      No.  In fact, there appeared to have been furniture

20  that had been recently been moved into the area, but it was

21  not heavy or difficult to move.

22  Q.      And then if you look closely there at the picture on

23  the left, there is quite a bit of crayon and other marking

24  on the wall, indicating that the wall had been open at some

25  point, correct?

1  A.       That is correct.

2  Q.       So you talked about some ammunition.  Can you tell

3  us where in the house the ammunition was located?

4  A.       Yeah.  There were multiple boxes of ammunition that

5  were located in various rooms throughout the house,

6  including there was a single round of ammunition that was

7  located in a dresser drawer in the other child's bedroom,

8  not the one photoed.

9       There was a box of ammunition in the laundry room,

10  along with three empty Glock boxes and in various locations

11  throughout the house.

12  Q.       I understand that firearm boxes often came with the

13  number or the serial number of the firearm on there.  Was

14  that the case here?

15  A.       On two of the three boxes, we could read the serial

16  number.  On one of the boxes, the serial number had been

17  scratched off.

18  Q.       For the two that had the serial number, was there

19  anything notable about who purchased those weapons in terms

20  of their relationship or lack thereof of Mr. Waide or

21  Ms. Lang?

22  A.       Traces were performed on the serial numbers of those

23  firearms, but they were not found to be anyone associated

24  with Ms. Lang or Mr. Waide.

25  Q.       What did law enforcement learn about the firearm

1  that was hidden in the children's bedroom?

2  A.      The firearm that was recovered was also NIBIN tested

3  and a NIBIN lead was confirmed to the October 26, 2024

4  shooting that we were discussing earlier with the Chevrolet

5  Cruze and the silver Lexus.

6  Q.      So did law enforcement, or, excuse me, the firearm

7  found by law enforcement in this apartment was the same

8  firearm that was used in the October 2024 shooting?

9  A.      Yes.  This was the .45 caliber that was -- more

10  shell casings were located inside the Chevrolet Cruze.

11  Q.      What about the purchase information about the

12  firearm; was there anything notable about that?

13  A.      The firearm was purchased by Ms. Sierra Lang on I

14  believe it was October 11, 2021.

15  Q.      What's notable about that?

16  A.      Mr. Waide's birthday is October 10, so it was just

17  one day after his birthday.

18  Q.      And so I know you said before that Ms. Lang tried to

19  claim possession or ownership of the firearm; what about the

20  ammunition?

21  A.      Ms. Lang told us that the firearm was hers, but she

22  did not say anything about any of the ammunition in the

23  household.

24  Q.      What was Mr. Waide arrested for, if anything, the

25  day of the search warrant?

A.      The day of the search warrant Mr. Waide was arrested
by Richmond Police Department for fleeing.

Q.      And then he was eventually charged federally via a
complaint in this case, correct?

A.      That is correct.

Q.      When you arrested Mr. Waide for this offense, what
statements, if any, did he make?

A.      When we arrested Mr. Waide, he inquired as to the
reason why he was being arrested or what the charges were.
I explained to him that it was firearms-related, in which he
said that he was not on probation and that he could have a
gun.

        And I explained to him that this was stemming from an
October 2024 shooting.  And his only response to that was
"stupid."  I took this to mean that he was frustrated that
we were charging him with this particular event, but he did
not deny that he was involved in the shooting, did not deny
that he had shot back, and he also -- by acknowledging that
he was no longer on probation, to my understanding, was
saying that he knew that he could not have a firearm while
on probation.

Q.      So I want to start talking about matters that are
more specific to detention and not the charges at issue in
the complaint.

        You mentioned before that law enforcement wanted to

1  search Mr. Waide's phone, in part, because the October 2024

2  shooting, but also in part because of his involvement in the

3  murder of Kristopher Lewis; is that correct?

4  A.      That is correct.

5  Q.      Who was Kristopher Lewis?

6  A.      Kristopher Lewis, when he was killed, was a

7  co-defendant and cooperating witness in a DEA investigation.

8  Q.      Who was Mr. Lewis's co-defendant?

9  A.      A Mr. Rollie Lamar.

10  Q.      Can you tell us about their respective roles in

11  their drug trafficking conspiracy.

12  A.      Mr. Lewis was a drug courier for Mr. Lamar.  He was

13  tasked with transporting drugs and money wherever Mr. Lamar

14  needed him to take them.

15  Q.      When Mr. Lamar was arrested, what was his theory on

16  how law enforcement caught him?

17  A.      Mr. Lamar believed that Mr. Lewis had cooperated

18  against him, and that's what had led to his arrest, but that

19  was -- that was untrue.

20  Q.      And so after Mr. Lamar was arrested, Mr. Lewis had

21  also been arrested at that point, correct?

22  A.      They were arrested the same day.

23  Q.      All right.  And they were charged federally at some

24  point?

25  A.      They were.

1  Q.      Tell us about how that case proceeded.

2  A.      As the case proceeded, law enforcement approached

3  Mr. Lewis about cooperating.  He agreed to cooperate and

4  provided multiple statements through proffers and was

5  willing to testify against Mr. Lamar.

6  Q.      Was Mr. Lamar aware of that?

7  A.      Mr. Lamar became aware when discovery was provided

8  to him in which he saw the proffers with with law

9  enforcement.

10 Q.      Tell us what happened on September 29, 2023.

11 A.      On September 29, 2023, at approximately 8:15 a.m.,

12 Mr. Lewis was driving to work at 132 Trade Street, Koch Air.

13     When Mr. Lewis parked and exited his vehicle, witnesses

14 described three masked individuals exited a dark-colored

15 sedan and shot and killed Mr. Lewis in the parking lot

16 before fleeing the scene in that same dark-colored sedan.

17 Q.      So how long according to the witnesses had that

18 dark-colored sedan been sitting in the parking lot that

19 morning?

20 A.      Witnesses described that that dark-colored sedan had

21 been in the parking lot a significant period of time, and

22 they were unsure if anyone was inside the vehicle.  But a

23 short period of time prior to Mr. Lewis arriving, the

24 vehicle turned on and the headlights came on and people

25 inside realized that there were occupants inside the

1  dark-colored sedan.

2  Q.      Who does law enforcement believe shot Mr. Lewis?

3  A.      At this time, law enforcement believes that the

4  people that killed Mr. Lewis were Da'Quis Sharp, William

5  Dixon, Desmond Bellomy and Jatiece Parks.

6  Q.      Individuals that we saw pictured with Mr. Waide

7  earlier?

8  A.      All members of the Hot Boyz gang.

9  Q.      So what was the first clue that those Hot Boyz

10  members were responsible for the shooting?

11  A.      The vehicle that they were driving was a black Acura

12  TL, a known vehicle of Mr. Da'Quis Sharp.

13  Q.      And other than the witness statements, how did law

14  enforcement to know that the assailants were driving that

15  dark-colored sedan?

16  A.      Flock cameras were utilized to identify the black

17  Acura.  It was the only vehicle that fit the description

18  that was active on the morning of the shooting.

19  Q.      And I understand that the homicide itself is not

20  visually captured on video, but some relevant portions are;

21  is that right?

22  A.      That is correct.

23  Q.      I'm going to show you a thumbnail of that video

24  which has been premarked at Government Exhibit 9.  Do you

25  recognize that?

```
 1  A.      I do.

 2  Q.      What is that?

 3  A.      This video comes from a van that was parked at 132

 4  Trade Street that morning.  As you mentioned, it does not

 5  capture the actual shooting itself, but it has audio and you

 6  can hear the gunshots.

 7  Q.      Does it also capture the dark-colored sedan that you

 8  described?

 9  A.      It does.

10          MS. MELTON:  Your Honor, the Government moves to

11  admit Government Exhibit 9 and publish it.

12          THE COURT:  Any objection?

13          MS. LAWSON:  No objection, Your Honor.

14          THE COURT:  So admitted.

15  Q.      And, Special Agent Robison, as we're watching this,

16  if you could just narrate some of the relevant portions,

17  namely the vehicles that are coming in and out of the scene.

18  A.      Yes.

19          (Playing Video Recording of Government's Exhibit

20  Number 9.)

21  A.      That is Mr. Lewis in the vehicle.  And that is the

22  black Acura described by witnesses.

23  Q.      You mentioned that flock cameras captured that same

24  vehicle.  For those of us that don't know, what is a flock

25  camera?
```

1  A.      Flock cameras are utilized throughout the city,

2  license plate readers, that capture the license plate and a

3  generic picture of the vehicle.

4  Q.      What else did law enforcement learn about the Acura?

5  A.      Law enforcement learned that that vehicle was

6  unknown, was known to be operated by Mr. Da'Quis Sharp.

7  Q.      Again, we heard a lot of gunfire there.  Were shell

8  casings collected from the scene?

9  A.      Yes, multiple shell casings were collected at the

10  scene.

11  Q.      What, if anything, did those shell casings tell us

12  about either the involvement of Mr. Sharp or that Acura?

13  A.      The shell casings were also NIBIN tested.  The shell

14  casings were linked.  There were nine millimeter shell

15  casings that were collected on the scene as well as .40

16  caliber shell casings that were collected.

17      The nine millimeter and the .40 caliber were both

18  linked to shootings that took place, once -- one on April 4,

19  2023, and another on March 4, 2023.

20      Specifically on the March 4 incident, the black Acura

21  sedan can be seen just prior to the shooting on video and is

22  believed to be the suspect vehicle, as well as on Ray

23  Street, the black sedan, the Acura was also a suspect

24  vehicle in that shooting as well.

25  Q.      And we're not showing those videos just to try to

1  save some time here today, but it sounds like there are

2  videos of both of those incidents that clearly show the

3  Acura; is that right?

4  A.        That is correct.

5  Q.        So how did law enforcement confirm that Mr. Sharp

6  was still using the Acura in the lead up to this homicide?

7  A.        Law enforcement obtained call detail records which

8  provides the location of a cellphone at different times.

9  Those call detail records were obtained for a cellphone

10 associated with Mr. Sharp.  Those call detail records were

11 compared to flock camera images taken of the Acura and

12 compared.  And two days prior to the murder of Kristopher

13 Lewis, there was a match between the cellphone being

14 utilized by Mr. Sharp as well as the vehicle being captured

15 on a flock camera.

16 Q.        And what happened to the Acura after Lewis's

17 homicide?

18 A.        The Acura was abandoned very shortly after the

19 homicide at 1101 Centre Parkway in Lexington.

20 Q.        Was there anything significant found in the Acura?

21 A.        Law enforcement located the Acura and then obtained

22 search warrants.  When they searched the vehicle, there was

23 a hat that was located inside the vehicle that was very

24 similar, if not the same hat that was known to be worn by

25 Mr. Da'Quis Sharp.  The hat on the side had embroidered,

1  "Big Pooda", which was the nickname for Da'Quis's brother

2  that had been killed in 2020, that we referenced earlier,

3  Ja'Quis Ray.

4     There was also a shell casing that was located inside

5  the vehicle that matched to some of the shootings that had

6  been linked to Trade Street to those shell casings.

7  Q.     So we've talked a lot about Mr. Sharp and the black

8  Acura.  What evidence do we have of Mr. Dixon's involvement?

9  A.     Call detail reports or records were also obtained

10 for a phone number associated with Mr. Dixon.  Those call

11 detail reports showed that Mr. Dixon was in the same area as

12 Mr. Lamar just a few days prior to the time of the homicide

13 in Louisville, Kentucky.

14     Those call detail records also showed Mr. Dixon at

15 Mr. Lewis's residence, and the reason that I say "at his

16 residence" is we were able to obtain much more precise

17 records with Mr. Dixon, and they appear that he is very,

18 very close to Mr. Lewis's residence just a day prior to the

19 homicide, as well as in the area of Trade Street, again,

20 that day just prior to the homicide.

21     We also collected cellphones from multiple people that

22 we believe to be involved, and searched those cellphones.

23     Mr. Dixon's cellphone was searched, and it was found

24 the day prior to the homicide in a group chat Mr. Dixon sent

25 a message with Mr. Lewis's license plate number.

1  Q.      Where was Mr. Dixon when he sent that message with
2  Mr. Lewis's license plate number?
3  A.      In the area of 132 Trade Street, when Mr. Lewis
4  would have been at work, according to his work logs.
5  Q.      After the homicide, were there any significant
6  historical cell site location data?
7  A.      So after the homicide, again, records were reviewed
8  for later that day on the 29th of September.  Mr. Dixon was
9  again found to be in the same area as Mr. Lamar later that
10 day, and shortly after that time period, is when we searched
11 his phone.  We found photos of Mr. Dixon with large amounts
12 of cash, as well as the following day he posted multiple
13 videos in which he has large amounts of cash.
14 Q.      When you say "large amounts of cash," I'm sure it's
15 hard to be precise, but approximately how much does it
16 appear that he's flashing?
17 A.      It appears to be thousands of dollars.
18 Q.      And then what evidence do we have of Mr. Bellomy's
19 involvement?
20 A.      Call detail reports were also collected for the
21 phone associated with Mr. Bellomy.
22     Similar to Mr. Dixon, his phone was placed in the area
23 of Mr. Lewis's residence, as well as 132 Trade Street in the
24 days leading up to the homicide.  And on the day prior to
25 the homicide, law enforcement was able to obtain

1  Mr. Bellomy's former girlfriend's cellphone and obtained a
2  search warrant for that phone in which she had
3  screen-captured Mr. Bellomy's location the day prior to the
4  homicide in which he was -- appeared to be right in front of
5  Mr. Lewis's residence at the same time that Mr. Dixon would
6  have been there as well.
7  Q.     So she was tracking his location with, you know,
8  like 360 or something like that and actually captured that
9  location with her phone by a screenshot; is that right?
10 A.     That is correct.
11 Q.     And it was outside of Mr. Lewis's house?
12 A.     Yes.
13 Q.     On what day?
14 A.     That was on September 28, 2023, the day prior to the
15 murder.
16 Q.     You noted that some search warrants were done on
17 cellphones.  Were there any conversations the morning of the
18 homicide pointing to Mr. Dixon and Mr. Bellomy's
19 involvement?
20 A.     There were -- when we searched cellphones, there
21 were conversations between Mr. Dixon and Mr. Bellomy early
22 on the morning of the 29th of the homicide in which they are
23 coordinating when to come pick each other up, and also
24 Mr. Dixon asked Mr. Bellomy where the gloves were located.
25 Q.     How does Mr. Waide tie into all this?

1 A.      Mr. Waide, we also recovered call detail reports for

2 the phone associated with Mr. Waide at the time.  We

3 requested those records because again, as we're reviewing

4 conversations, there was a conversation on the night of the

5 homicide between Mr. Dixon and Mr. Da'Quis Sharp in which

6 they were discussing how much to pay Mr. Waide.

7      At that time, they discussed that they -- or they

8 agreed to pay him $1,000 for his involvement, and at that

9 time, Mr. Dixon replies that he said -- referring to

10 Mr. Waide -- that that's fine 'cause he just got in the car.

11      When we compared Mr. Dixon's call detail reports to

12 Mr. Waide's, they were in the same area at that time when

13 the message was sent.

14 Q.      So let's take a look at those text messages.  I'll

15 put it up on your screen.

16      So the little green and blue boxes, those were added by

17 us just to make this easier to read, correct?

18 A.      That is correct.

19 Q.      Otherwise, does this accurately reflect what you all

20 abstracted from one of the assailants' devices?

21 A.      Yes, it does.

22 Q.      And whose phone did this come from?

23 A.      Mr. Dixon's phone.

24 Q.      Okay.  And walk us through what we're seeing here.

25 You already told us a little bit about it, but just so we

1  understand what we're seeing.

2  A.      So as you can see the very top boxes, that is a

3  message sent from Mr. Da'Quis Sharp to Mr. William Dixon

4  where he says, "We are going to give Fred -- " referring to

5  Mr. Waide " -- probably a hundred each." And then Mr. Dixon

6  responds, "Yet, and Doja -- " Doja is Mr. De'Angalo Boone --

7  "and give him five." And he responds, "Beth" -- because he

8  was talking about a band, which refers to a thousand -- but

9  either way, it was 250 each from the four of us. And the

10 four of us, as I said earlier, believed to be referring to

11 the four people that were in the car when Kristopher Lewis

12 was killed, which would be Mr. Da'Quis Sharp, William Dixon,

13 Desmond Bellomy, and Jatiece Parks.

14      Then it says, "Yeah, it don't matter to me. He just

15 got in the car and said you all give me five, but what you

16 want to give him a thousand?"

17      And again, this is referring to "he" would be Mr. Waide

18 had just got in the car and was saying that they could give

19 him a thousand.

20      Dixon again responds with a question mark. And

21 Mr. Sharp, when he responds, says, "It doesn't matter. It's

22 just 250 each, but it's your call on this one." And he

23 said, "We can give him the band, or a thousand, and that's

24 what you said in the first place," and Mr. Da'Quis Sharp

25 responded, "Beth."

1  Q.      And you mentioned at the time of this conversation

2  Mr. Waide was seen in the same location as Mr. Dixon based

3  off of the cell site location records, correct?

4  A.      The cellphones associated with Mr. Waide and the

5  cellphone associated with Mr. Dixon were in the same area at

6  the time that these messages were sent.

7          MS. MELTON:  Oh, I neglected to get this exhibit

8  admitted.

9      Your Honor, the government moves to admit Government

10 Exhibit Number 10.

11         THE COURT:  Any objection?

12         MS. LAWSON:  No objection, Your Honor.

13         THE COURT:  So admitted.

14 Q.      So before we talk about the next relevant piece of

15 Mr. Waide's call detail records, I want to back up a tiny

16 bit and talk more about the get-away vehicle from the

17 homicide.

18      You mentioned that the Acura was dumped, correct?

19 A.      Yes.

20 Q.      So if it was abandoned, how did the assailants get

21 back to where they lived, or what did they drive after that?

22 A.      We believe that there was a vehicle that was staged

23 for them that we believe to be a black Dodge Durango.

24 Q.      What do we know about that Dodge Durango in terms of

25 who had it before it was used that day of the homicide, who

1  used it afterwards?

2  A.      The vehicle, we believe prior to the time that —- or

3  prior to the time of the homicide, that it was used by a

4  Mr. Doss, and that was the last known person that we had in

5  possession of it.  And then in January 2024, it was

6  recovered in the possession of a Mr. Tyrone Moss.

7  Q.      So we talked about Mr. Waide's location that you've

8  named of the homicide at or around the time of payment, was

9  there any notable activity from the morning prior to it

10  taking place?

11  A.      In review of Mr. Waide's call detail records, his

12  phone was very active in the early morning of September 29.

13  He was in the area of Glen Arvin Avenue here in Lexington,

14  Kentucky, around 1 a.m.  He was there for several hours.

15  That location is of note because Mr. Tyrone Moss lives at

16  409 Glen Arvin Avenue, and at that time, Mr. Moss was on

17  ankle monitor.  His ankle monitor was reviewed and was

18  located at his residence at 409 Glen Arvin at the time that

19  Mr. Waide was in that area.

20       Shortly after Mr. Waide's cellphone appears to be

21  leaving that area from Glen Arvin at 4:11 a.m., Mr. Moss

22  called Mr. Waide briefly, and then Mr. Waide continued to

23  the area of Centre Parkway and was there for a short period

24  of time, and his cellphone moved into the area of Warwick

25  Drive, which is where Mr. Bellomy and Mr. Dixon were at the

1  time were living, and is there briefly before he returns to

2  the Glen Arvin area and ultimately out to Athens-Boonesboro

3  area in Lexington where he stayed for the remainder of the

4  day until the late afternoon.

5  Q.      And you noted that Centre Parkway was where the

6  Acura was abandoned, correct?

7  A.      That is correct.

8  Q.      And you also mentioned that you thought that a

9  vehicle had been staged for them to pick up after abandoning

10  the Acura; is that right?

11  A.      We believe so.

12  Q.      And Mr. Waide was in that area the morning of the

13  homicide?

14  A.      He was.

15  Q.      And Mr. Waide was on probation in fall 2023, when

16  all of this was going on, correct?

17  A.      That is correct.

18          MS. MELTON:  That's all I have for this witness,

19  Your Honor.

20          THE COURT:  Thank you.

21      Cross-examination, Ms. Lawson.

22          MS. LAWSON:  Thank you, Your Honor.

23      Do you want me to stay there or move up there?

24          THE COURT:  Either one's fine with me.

25          MS. LAWSON:  Okay.  I'll move.  That might be a

1  little easier.

2                    CROSS-EXAMINATION

3  BY:  MS. LAWSON:

4  Q.     Okay.  Agent, I'm going to be moving slow because

5  it's a day after a long weekend, but I need some

6  clarification, I think, in terms of dates for these

7  shootings and homicides.  So can you provide those dates

8  again and whether there's homicides that are being

9  investigated or shootings that are being investigated.

10 A.     Yes, ma'am.  So I mentioned multiple events, one of

11 which was the murder of Mr. Ja'Quis Ray.  That took place on

12 December 28, 2020, here in Lexington.

13        Another homicide that was mentioned was Mr. Eric Boone,

14 which took place on May 17, 2022.

15        Another homicide that was mentioned was that of

16 Mr. Zion Clark, and that was mentioned because Mr. Waide was

17 also a victim in that case, and that was on March 29, 2020.

18        I mentioned the Malik Sleet homicide, which took place

19 on August 27, 2023.

20        The other homicide that we spoke the most about here

21 towards the end was that of Mr. Kristopher Lewis.  That took

22 place on September 29, 2023.

23        We also mentioned the homicide of Mr. Jadyn Sleet on

24 October 24, 2024.

25        Two days later on October 26, 2024, was the shooting

1 that Mr. Waide was involved in at Old Todd's and Palumbo

2 Drive.  And if there are others that I mentioned, please let

3 me know.

4 Q.     I'm going to trust you on that because there were a

5 lot of dates.

6      So it sounds to me, correct me if I'm wrong, it sounds

7 to me of all of those dates and homicides and shootings that

8 you all have been investigating, Mr. Waide was directly

9 involved in the March 29, 2020, correct?

10 A.     Yes, ma'am.

11 Q.     And he was a victim, right?

12 A.     Correct.

13 Q.     Okay.  And if I'm understanding correctly, there was

14 a statement made by a witness to investigators that Waide

15 said something along the lines of, "We'll get them back," or

16 something along those lines; am I remembering that

17 correctly?

18 A.     That is correct.

19 Q.     Okay.  And that's all that was reported in terms of

20 that, correct?

21 A.     Yes, ma'am.

22 Q.     Okay.  The only other one that seems he's possibly

23 directly connected with is with the shooting between the two

24 cars; am I correct about that?

25 A.     Yes, he was directly involved in that.

Q.      Okay.  And it sounds like the evidence of his direct
involvement was simply a witness reporting that they saw a
black male with dreadlocks leaving the Chevy Cruze?
A.      That is correct, as well as the documents that were
found inside the vehicle, and then the gun being linked to
the shooting that was then found in his residence.
Q.      And I need to clarify.  So the shells that were
found in the Cruze, has there actually been ballistics
testings that have -- that's been done to show that they
were shot by that firearm, or are we matching the shell
casings to ammunition that fits the gun that was found in
Ms. Lang's residence?
A.      NIBIN testing was completed on the shell casings
that were located inside the Cruze, and NIBIN testing
confirmed a lead.
     At this point, if that's what it's referred to as a
lead, that the shell casings match the shell casings that
were then fired from the firearm, and they are a preliminary
match.
          MS. LAWSON:  Okay.  Say that again.
A.      Sure.
Q.      It sounds like -- is it -- have you all done all the
testing you can to prove that it's absolutely a match?
A.      So at this point, we have not done the final
testing.  That takes place at a later time when we do an

1 official request.

2      The initial what is done is called a lead, and the lead

3 shows that the firearm -- because when they collect the

4 firearm, they take it and they shoot test examples from it,

5 and then they compare that to other shell casings that they

6 have in their database.  That test fire and the shell

7 casings that were collected inside the vehicle were a match.

8 Q.      So this final testing -- what's done in regards to

9 the final testing?

10 A.      That's just a -- an official expert does their final

11 test and writes up a report for them.

12          MS. LAWSON:  Okay.

13 A.      That is done in the lab.

14 Q.      Okay.  And with Exhibit Number 3 that you testified

15 to, it sounds like these were posts from a -- did you say

16 Mr. Davis who is a Hot Boyz associate?

17 A.      Yes, ma'am.

18 Q.      Okay.  What was his full name?

19 A.      Marvelous Davis.

20 Q.      Okay.  And is this -- has he screenshotted from

21 someone else -- from someone else's Snapchat and is sending

22 this in a message to Mr. Waide through Snapchat?

23 A.      So that is correct.  So the first portion that you

24 see there, someone posted this picture of Mr. Malik Sleet,

25 and then Mr. Marvelous Davis commented on that post that

1  that person made, and that's what's spurring the

2  conversation between Mr. Davis and Mr. Waide.

3  Q.      Okay.  So all these statements of -- at the end of

4  the day, "We're going to get back regardless.  Fuck all them

5  bitch ass," all that, that is from Mr. Sleet, correct?

6  A.      No, that is from the person that posted this in

7  remembrance of Mr. Sleet.

8  Q.      Okay.  So -- but none of -- that was not Mr. Waide,

9  correct?

10  A.      Correct.

11  Q.      Okay.  And then the exchange here, I'm assuming -- I

12  don't know that you ever clarified this -- the "Freddie

13  Self-paid", that is Mr. Waide?

14  A.      Yes, ma'am.

15  Q.      How have you all confirmed that?

16  A.      So I believe that to be true because of a couple

17  different reasons.  One, Mr. Waide's nickname is Freddie.

18  And then the person that posted that, "Long live Malik,"

19  lived in very close proximity to Mr. Waide at the time.  And

20  one of the things that Mr. Davis says in the beginning is,

21  "This person is the one that lives by you."

22  Q.      Okay.  But did you get this information from sending

23  a, like, from directly contacting Snapchat, a subpoena to

24  Snapchat to get this information?

25  A.      In part of the investigation into Mr. Davis.

1  Q.      Okay.  So you did not request any of those documents

2  in regards to Mr. Waide from Snapchat, correctly?

3  A.      Correct.

4  Q.      Correct?

5      So that determination is simply based on context of

6  information that you all know, right?

7  A.      Yes, ma'am.

8  Q.      Okay.  In regards to Exhibit 5, I know we saw that

9  video.  Did I under -- did I see that there were four

10  individuals that got out of the sedan that was at the one

11  that we see easiest?

12  A.      Yes, ma'am.

13  Q.      Okay.  On that video, did it show anyone getting out

14  of this Chevrolet Cruze?

15  A.      No.

16  Q.      Okay.  So all we see in the Chevy Cruze is just the

17  driving in all these dash cam videos, correct --

18  A.      Yes.

19  Q.      -- driving off away from the scene?

20  A.      That is correct.

21  Q.      And it being pursued by the sedan where four

22  individuals got out and actually shot at the Chevrolet

23  Cruze, right?

24  A.      Correct.  And then you can hear the return gunfire

25  as well as when the vehicle was searched.  You can tell that

1  gunfire was returned from the Cruze at the other vehicle,

2  which would be why there are shell casings inside, as well

3  as witness testimony of that.

4  Q.     Okay.  So how did you all distinguish returning

5  gunfire from the initiating gunfire?

6  A.     Based off the sound.  The -- what witnesses

7  described as the silver sedan, there was a person hanging

8  outside the window using a large caliber rifle versus what

9  Mr. Waide would have been shooting was a handgun.

10  Q.     Okay.  So only -- people only saw one individual

11  shooting from the silver sedan?

12  A.     When they were moving on Patchen Drive, yes.

13  Q.     Okay.  But all four of those individuals appeared to

14  me to be shooting --

15  A.     That is correct.

16  Q.     -- when they exited, correct?

17  A.     That's correct.

18  Q.     Okay.  Do you all have an expert that is able to

19  distinguish gunfire and returning gunfire?

20  A.     Not to my knowledge.

21  Q.     Okay.  So that's just based on your experience?

22  A.     Yes, ma'am.

23  Q.     Okay.  And the shell casings that were found in the

24  Cruze, is there any way to determine when those shell

25  casings were expended?

1  A.        Not to my knowledge.

2  Q.        Okay.  And so it's simply an assumption that the

3  casings that were found in the Chevrolet Cruze was from that

4  shooting on October 26, '24, right?

5  A.        There were also .45 caliber shell casings that were

6  collected on Patchen Drive.

7  Q.        Okay.  How is that connected?

8  A.        So when they were driving, moving, that was on

9  Patchen Drive, and I believe Mr. Waide was returning fire.

10 So those shell casings would have been ejected and found in

11 the street on Patchen Drive.

12 Q.        Okay.  How much later were those shell casings

13 found?

14 A.        That same day when the police responded out there,

15 they went along the entirety of the scene.  They started at

16 Old Todd's and Palumbo, and went down Patchen Drive

17 collecting shell casings.

18 Q.        Okay.  You went through a lot of information with --

19 in terms of the Lewis murder that you all are investigating,

20 but it sounds to me like the only connection you've made

21 between Mr. Waide and that murder is simply the text

22 messages that were entered into evidence; is that correct?

23 A.        The text messages, along with the call detail

24 reports.

25 Q.        Okay.  Which just simply shows him calling

1  individuals, right?

2  A.      As well as the location of his phone.

3  Q.      As well as the location of his phone.

4    Were you all able to verify that he was in fact using

5  his own phone that day?

6  A.      No.

7  Q.      Okay.  And all the messages had is that Mr. Waide is

8  getting paid $1,000 by four individuals, right?

9  A.      Correct.  And they were specifically talking about

10  something that had just taken place that day that they had

11  just gotten paid for.

12    And I guess we do have Mr. Waide -- Mr. Dixon referring

13  to Mr. Waide had just gotten into the car, and his call

14  detail reports do put him in that location with Mr. Dixon,

15  which is why we believe that he was in use of that phone

16  that day.

17  Q.      But you all have never found any direct evidence of

18  actually what Mr. Waide was getting paid for, have you?

19  A.      We have ideas of what we believe he was paid for.

20  Q.      Okay.  So when you're stating that he's getting, you

21  know -- your testimony's that he's getting paid for placing

22  the car that they have available for him after they've

23  ditched the Acura, that is just your all's theory in terms

24  of what that payment was for, correct?

25  A.      Yes, ma'am.

1  Q.      Okay.  Okay.  In terms of the complaint that he is

2  here on today, you were the author of that complaint,

3  correct?

4  A.      Yes, ma'am.

5  Q.      Okay.  So the firearm was in fact found in the home

6  of his girlfriend Sierra Lang; is that correct?

7  A.      That is correct.

8  Q.      And Ms. Lang and Mr. Waide, they share a child

9  together?

10  A.      Yes, ma'am.

11  Q.      But Ms. Lang also has other children, correct?

12  A.      Yes, I believe so.

13  Q.      Do you know how many other children?

14  A.      I believe she has one other child, but I am not

15  sure.

16  Q.      Okay.  And we've seen a picture of the child's

17  bedroom that the gun was found in.  That was not Mr. Waide's

18  child's bedroom, was it?

19  A.      I do not believe so.

20  Q.      Okay.  And after doing the search -- well, even

21  quite frankly before doing the search, Ms. Lang actually

22  states that there's a firearm in the house.  Am I

23  understanding that correctly?

24  A.      That is correct.

25  Q.      Okay.  And she takes ownership of that firearm?

1  A.      She did.

2  Q.      Okay.  And she indicated that she kept that firearm

3  to protect her children; is that right?

4  A.      She said that she had hid it to protect it from her

5  children.

6  Q.      Okay.  But she was the one that did the hiding --

7  A.      That's what she told us --

8  Q.      -- correct?

9  A.      -- yes, ma'am.

10 Q.      Okay.  And in fact, you indicated that there was

11 ammunition found throughout the home?

12 A.      Yes.

13 Q.      And I think it just states "in various locations

14 throughout the residence;" is that right?

15 A.      That is correct.

16 Q.      But it sounds to me like none of the ammunition

17 found matches the firearm, right?

18 A.      There was some .45 caliber that was found in the

19 house.

20 Q.      Okay.  And there were three empty gun boxes; is that

21 right?

22 A.      Yes, ma'am.

23 Q.      Okay.  Sounds like you were able to run the serial

24 number on two of those?

25 A.      Yes, ma'am.

1    Q.      Okay.  And there was no connection at all between

2    those gun boxes, the serial numbers between Mr. Waide or

3    Ms. Lang, right?

4    A.      When we run the -- what we can do is we can run

5    those serial numbers for the last known purchaser of those

6    firearms.  And so when we ran those firearms, the last known

7    purchaser was not someone known to us at the time to have

8    any relationship with them.

9    Q.      Okay.  And you state, though, the firearm that was

10   found, you all were able to determine, that was purchased

11   the day after Mr. Waide's birthday; is that right?

12   A.      Yes, ma'am.

13   Q.      Okay.  But it was purchased by Ms. Lang, right?

14   A.      Yes.

15   Q.      The gun is in her name?

16   A.      Yes, ma'am.

17   Q.      Any indication that she purchased that on behalf of

18   Mr. Waide?

19   A.      Other than the fact that it was purchased the day

20   after his birthday, which would appear to be a birthday

21   present, no.

22   Q.      Okay.  But that's just an assumption, right?

23   A.      Yes, ma'am.

24   Q.      Quite frankly, birthday presents make more sense to

25   be bought the day before, right?

```
 1  A.      Yes.

 2  Q.      Okay.  And I think you also indicated that prior to

 3  executing the search warrant, they were actually doing

 4  surveillance on Mr. Waide around Ms. Lang's residence,

 5  right?

 6  A.      That is correct.

 7  Q.      And immediately before executing the search warrant,

 8  they saw Mr. Waide out.  Was he -- I think he was just

 9  walking his dog or something; is that right?

10  A.      That is correct.

11  Q.      And they indicated that they witnessed something

12  heavy on his waistband?

13  A.      They said that when he fled from them, he appeared

14  to put his hand on his waistband to support something heavy

15  that would be consistent with a firearm.

16  Q.      Okay.  But they never saw any firearm per se it

17  sounds like?

18  A.      No, ma'am.

19  Q.      Okay.  He was searched -- his person was searched,

20  right?

21  A.      Well, he fled into the house.  And then after 25

22  minutes of being in the house, when he came out, then he was

23  searched.

24  Q.      Okay.  No firearm found on him?

25  A.      No.
```

1  Q.     Okay.  What type of pants was he wearing?

2  A.     I do not recall.

3  Q.     Do you know?

4          MS. LAWSON:  Okay.  Judge, if I can have just a

5  second.

6          THE COURT:  Certainly.

7  Q.     Oh.  And in terms of the gun tracing, what was done

8  to verify that they had crossed state lines?

9  A.     So the manufacturer of the firearm, that type of

10 firearm, a Glock, is not manufactured inside the state of

11 Kentucky.

12 Q.     Okay.  And that -- you know -- I know that they

13 usually do like reports showing that they've traced these

14 guns down specifically.  That hasn't been done with this

15 firearm yet, though, has it?

16 A.     The nexus report is being performed currently by the

17 ATF.

18         MS. LAWSON:  Okay.  Thank you.  Nexus report's

19 what I was looking for.

20 Q.     And in terms of Mr. Waide's residence, it's your

21 understanding that Mr. Waide actually resides primarily with

22 his mother, right?

23 A.     No, it is my understanding that he resides primarily

24 with Ms. Sierra Lang.

25 Q.     Okay.  And where did you get that information from?

1  A.       From surveillance.

2  Q.       Okay.  How long did you all do surveillance?

3  A.       We did the surveillance -- well, I didn't personally

4  do it, but Lexington Police Department and Richmond Police

5  Department did it the day of, as well as the day that we

6  arrested him at the courthouse.  And then when we did the

7  search, it appeared based off of his belongings and things

8  in the house that that was his primary residence.

9  Q.       Okay.  So that -- like, as a result of surveillance

10 of about three days is my understanding; is that correct?

11 A.       Yes.

12 Q.       Okay.  And just simply belongings of his that was

13 found in the residence?

14 A.       And where Ms. Sierra Lang lived.  Prior to this in

15 Lexington, we had done surveillance on multiple days where

16 they lived there and saw Mr. Waide multiple times in and out

17 of that residence, so that is why we believe that he is

18 primarily residing with her.

19 Q.       When was that surveillance done?

20 A.       That would have been early 2024, potentially the

21 summer.  I don't have those dates in front of me.

22 Q.       And I think you testified as to furniture that was

23 in the room.  I wasn't quite clear as to what you were

24 stating about -- are you suggesting that furniture was moved

25 in the room where the firearm was found?

1  A.      One of the officers -- or the officer that located

2  the firearm indicated that he saw marks in the carpet that

3  appeared that furniture had been moved around.

4  Q.      Okay.  Well, where was the furniture -- where did he

5  believe the furniture was before it got moved?

6  A.      It appeared that the furniture had been moved to be

7  placed on top of that floor vent.

8  Q.      Okay.  So -- and those were like -- when you say

9  "marks," it means like there -- that was a carpet, right?

10 A.      Yes, ma'am.

11 Q.      So when you put furniture on one spot for a long

12 time, it makes marks in that carpet.

13        So it seemed to you that the bed had actually been over

14 top of the HVAC vent; is that right?

15 A.      No.  Another small piece of furniture had not been

16 on top of it until when law enforcement went in and they

17 were searching, they noticed that piece of furniture that

18 appeared to have been moved recently.  So they moved it over

19 away from the vents so that they could search the vent.

20 Q.      Okay.  So you're stating that this piece of

21 furniture was moved from where it usually is over top of the

22 vent?

23 A.      That is what the other law enforcement officer

24 recounted to me.  That is not something that I saw.

25 Q.      Okay.  So did the officers move that piece of

1  furniture?

2  A.       That is my understanding.

3  Q.       Okay.  Oh.  It also sounds in your investigation,

4  you have done a lot of seizing cellphones and have actually

5  done, like, forensic searches on these cellphones; is that

6  correct?

7  A.       That is correct.

8  Q.       Okay.  'Cause I know you testified that the

9  cellphone that was on Mr. Waide had been wiped clean or

10  reset?

11  A.       That is correct.

12  Q.       But any communication that he would have had with

13  any of these named alleged associates would have been on

14  their cellphones, correct?

15  A.       Potentially.  People delete text messages, they

16  delete different things off of their phones.

17  Q.       But, I mean, you didn't find some communication

18  between Mr. Waide and the others around the date of, say,

19  Mr. Lewis's murder?

20  A.       Yes, ma'am.

21  Q.       Okay.  I'm assuming that you haven't found any other

22  type of communication between Mr. Waide and the individuals

23  that you've identified as Hot Boyz, other than what's been

24  admitted here today?

25  A.       That's why we wanted to search Mr. Waide's phone.

1          MS. LAWSON:  Okay.  Judge, I think that that's all
2    that I have.
3          THE COURT:  Thank you, Ms. Lawson.
4      Redirect, Ms. Melton.
5                    REDIRECT EXAMINATION
6    BY:  MS. MELTON:
7    Q.      Special Agent Robison, when you all were searching
8    the residence down in Richmond, Ms. Lang was outside during
9    the search, correct?
10   A.      That is correct.
11   Q.      Ms. Ragland also showed up, correct?
12   A.      That is correct.
13   Q.      Both of them voluntarily spoke to you and Detective
14   George, correct?
15   A.      They did.
16   Q.      Did either of them claim that Mr. Waide was one of
17   the residents?
18   A.      No.
19   Q.      And you mentioned some belongings in the house, for
20   example, male shoes throughout the house.  Anything else
21   come to mind?
22   A.      I recall an ID badge of Mr. Waide's.
23   Q.      Okay.  And so when we're talking about the date of
24   purchase and that it was the day after his birthday versus
25   the day before, but that is the same weapon that was used

1  in -- on October 26, 2024, correct?

2  A.      Yes, ma'am.

3  Q.      No one saw a female leaving the vehicle that is

4  registered to Mr. Waide's aunt, correct?

5  A.      That is correct.

6          MS. MELTON:  That's all I have.  Thank you.

7          THE COURT:  Special Agent Robison, you can step

8  down; you're excused, sir, at least relative to the

9  preliminary hearing side of things.

10     Additional proffer of fact or witnesses on probable

11 cause, Ms. Melton?

12         MS. MELTON:  No, Your Honor.

13         THE COURT:  Proffer of fact or witnesses on the

14 issue of probable cause, Ms. Lawson?

15         MS. LAWSON:  Judge, I would like to go ahead and

16 call Mr. Waide's mother.

17         THE COURT:  Certainly.

18     Ms. Haddix.  Sorry.

19         COURTROOM DEPUTY:  Raise your right hand.

20         (The Witness LaSha Haddix was sworn.)

21         THE COURT:  Thank you.  Sorry about that.

22         Ma'am, once you get settled, if you could just

23 state your name for the record and spell your last name.

24         THE WITNESS:  It's LaSha Haddix, H-A-D-D-I-X.

25         THE COURT:  Thank you.

```
 1        Ms. Lawson.

 2                        Defense Case

 3                     DIRECT EXAMINATION

 4   BY:  MS. LAWSON:

 5   Q.      How are you, Ms. Haddix?

 6   A.      I'm fine.

 7   Q.      Ms. Haddix, do you know Mr. Waide?

 8   A.      Yes.

 9   Q.      And how do you know him?

10   A.      That's my son.

11   Q.      Okay.  And where do you currently reside?

12   A.      3725 (indiscernible.)

13   Q.      Okay.  And does Mr. Waide live there with you?

14   A.      Yes.

15   Q.      How long has he lived there?

16   A.      We moved there in 2021, roughly '22.

17   Q.      Okay.  And that has been his primary place of

18   residence since that time?

19   A.      Yes, ma'am.

20   Q.      Okay.  And you've heard testimony here today that he

21   is in a romantic relationship with Ms. Lang?

22   A.      Yes, ma'am.

23   Q.      And they share a child?

24   A.      Yes, ma'am.

25   Q.      Okay.  So does he spend some time at Ms. Lang's
```

1  house?

2  A.      Yes, ma'am.

3  Q.      How does he split his time between your residence

4  and her residence?

5  A.      Like you said, they have a child together, so

6  sometimes he helps out and stays there to help the child.

7     Also, he has two other children.  And when they're

8  there, he watches them there at my house.

9  Q.      Okay.  So he sees all of his children, right --

10 A.      Yes, ma'am --

11         MS. LAWSON:  Okay.

12 Q.      -- besides one.

13 Q.      Okay.  So the three that he has a relationship with,

14 his child with Ms. Lang, he often sees with Ms. Lang at her

15 residence?

16 A.      Yes, ma'am.

17 Q.      But any time sharing he has with the other two are

18 at your residence?

19 A.      Yes, ma'am.

20 Q.      And he sees them fairly regularly?

21 A.      Yes, ma'am.

22 Q.      Okay.  Since 2021, has Mr. Waide had -- maintained

23 employment?

24 A.      Yes, ma'am.

25 Q.      Okay.  Where all has he worked?

1 A.      I don't know exactly what the -- their name's
2 called, but he does have employment.
3 Q.      Okay.  And he's been there for a decent period of
4 time?
5 A.      Yes, ma'am.
6          MS. LAWSON:  Okay.  I know this is getting more
7 into the detention hearing side of stuff, but I don't want
8 to have to call you back again.
9 Q.      If the Court decides to release him on conditions,
10 can he return to residing with you?
11 A.      Absolutely.
12 Q.      Okay.  And will you help in ensuring that he
13 complies with any other conditions that the Court may deem
14 necessary?
15 A.      Absolutely.
16          MS. LAWSON:  Judge, I think that's all that I
17 have.
18          THE COURT:  Certainly.
19     Cross-examination, Ms. Melton.
20                    CROSS-EXAMINATION
21 BY:  MS. MELTON:
22 Q.      Ms. Haddix, how long did you say that Mr. Waide has
23 been living with you?
24 A.      We moved over there, like, '21, the first of '22,
25 but I think it was '21.

1  Q.      So some of the events that we talked about today

2  have occurred since 2021, and so he would have been living

3  with you part of the time that he was involved in these

4  other incidents?

5  A.      Yes, ma'am.

6  Q.      Did you know that he was engaging in that other

7  conduct?

8  A.      No, ma'am.

9  Q.      What percentage of time does he spend at your house

10 versus at Ms. Lang's house?

11 A.      I would say it's definitely split.  He works second

12 shift, so.

13 Q.      And do you live here in Lexington?

14 A.      Yes, ma'am.

15 Q.      And his job is in Richmond, correct?

16 A.      Yes.

17 Q.      So you think he spends at least 50 percent of the

18 time at Ms. Lang's house?

19 A.      I want to say, probably 45, 50 percent, just like at

20 my residence.

21          MS. MELTON:  Okay.  Thank you.

22          THE WITNESS:  Uh-huh.

23          THE COURT:  Redirect, Ms. Lawson?

24          MS. LAWSON:  No, Your Honor.

25          THE COURT:  All right.  Thank you.

1      Ms. Haddix, you can step down.  You're excused.  Thank

2  you.

3           THE WITNESS:  Thank you.

4           THE COURT:  Additional witnesses or proffer of

5  fact on the issue of probable cause, Ms. Lawson?

6           MS. LAWSON:  Nothing, Your Honor.

7           THE COURT:  All right.  I'll certainly allow

8  counsel to make legal arguments now on the issue.

9      Ms. Melton.

10          MS. MELTON:  Your Honor, this goes both to

11 probable cause and the weight of the evidence in terms of

12 our 3142 arguments.

13     But when Lexington Police Department went to do a

14 search warrant on Mr. Waide's home in April 2025, when he

15 fled from them, they saw something that appeared to be a gun

16 in his waistband, not directly, but he was supporting

17 something heavy as he ran away.  He went inside, stayed in

18 there for 25 minutes, came back out, without his phone they

19 had come to search for.

20     When they do a search warrant, they find the phone,

21 later discovering that it had been wiped.  They found

22 ammunition throughout the home.  And as the Court knows, 18

23 United States Code 922 prohibits possession of ammunition in

24 addition to firearms for those who have been convicted of a

25 misdemeanor crime of domestic violence.

1    And Ms. Lang who had claimed possession of this gun
2    claimed that she hid it for her children's benefit, that
3    story just doesn't really stand up to where law enforcement
4    found that weapon at ground level easily accessible to the
5    child.
6    When Mr. Waide was eventually arrested for this
7    offense, he didn't deny possession of the firearm, he just
8    said that he was on probation, so he thought that he was
9    allowed to have it.
10    Further, analysis from test fires from that firearm
11    show that it was involved in that October 2024 shooting that
12    involved Ms. Ragland's vehicle.  She has registered multiple
13    vehicles for Mr. Waide in her name.  His medical
14    documentation was found in the back seat.
15    A witness saw one person emerge from that car that was
16    registered to Ms. Waide, and run away, and that person was
17    consistent with Mr. Waide's description.
18    We know that Glock firearms are not manufactured in the
19    state of Kentucky, nor is Winchester ammunition, which was
20    also located in the residence.
21    It's undisputed that Mr. Waide has a misdemeanor crime
22    of domestic violence.  It was a pretty egregious event.  His
23    criminal history clearly shows that he was convicted for
24    assault, fourth for that incident, and case law indicates
25    that that is a sufficient basis for a 922(g)(9) offense.

1        So that's all I have on probable cause, Your Honor.

2            THE COURT:  Ms. Lawson.

3            MS. LAWSON:  Thank you, Your Honor.

4        The biggest thing, immediate issue with the
5    government's case here is, of course, possession.  I don't
6    think anybody can contest that there was no actual
7    possession of this firearm by Mr. Waide.  The best that
8    we've got is that there might have been something heavy on
9    his waistline during the surveillance.

10        So here we're -- there has to be proof of constructive
11   possession, which is an issue for the government here.  We
12   have a firearm that was found in the residence of his
13   girlfriend in an HVAC vent, which clearly the cover was on
14   before they took that picture of, the vent cover was to the
15   side.

16        Mr. Waide stays at that residence, but it's not his
17   full-time residency.  She is there 50 percent of the time
18   without him.  This was the firearm that was not found in his
19   child's room, but in the room of another child that Ms. Lang
20   shares with another individual.

21        She clearly stated that the gun was hers and that she
22   hid the gun very well, and stated that she kept it for the
23   protection of her children.  I certainly understand the
24   government's concerned about the fact that it was found in a
25   floor vent in a child's bedroom, but that's a concern

1  related to Ms. Lang, not Mr. Waide.

2      There was testimony that there's ammunition found

3  throughout the home, but there was no specifics as to where

4  that ammunition was found, outside of maybe a dresser

5  drawer, but we have no -- there's no specificity as to whose

6  dresser, which drawer, if it was easily found by any other

7  individual than Ms. Lang, who resided at the residence

8  full-time.

9      The empty boxes, yes, they were empty gun boxes.

10  Serial numbers have been traced on those.  There's no

11  connection to either Ms. Lang or Mr. Waide in regards to

12  those empty gun boxes.

13      Quite frankly, the only alleged connection, it sounds

14  to me like the government is suggesting between this firearm

15  and Mr. Waide, is that it was purchased the day after his

16  birthday.  But they cannot contest that it was purchased by

17  Ms. Lang.  It was put in Ms. Lang's name.  It was found in

18  Ms. Lang's home.  That is little to no evidence of Mr. Waide

19  having any connection to that gun, much less constructive

20  possession of that gun.

21      Constructive possession requires that the government

22  show that he knew he had the right to exercise control over

23  the gun and that he intended to do so to exert physical

24  control over the firearm, and that's just simply completely

25  unpresent from the testimony that we have heard to date.

It's very clear that this gun is in fact Ms. Lang's firearm of which there is absolutely no evidence that Mr. Waide was aware of its presence in the home, or that he intended, definitely not intended to use it.

So, Judge, I submit to the Court that they have not shown that they have -- that they've established the burden of probable cause.

THE COURT:  Ms. Melton.

MS. MELTON:  Your Honor, I hear a lot of (indiscernible) in those statements, and that may be true if we look at things in isolation.

However, Ms. Lang was not present at that October 2024 shooting that we have described in which that firearm was used.  There's no question that shell casings from the inside of that Cruze registered to Mr. Waide's aunt with his medical documentation in the back seat -- there are no question -- or there is no question, those shell casings match the firearm that was later found in a residence where he admittedly resides 50 percent of the time.  So if you don't stay there 50 percent of the time, does that give you a free pass for possession?

But furthermore, law enforcement saw him running with something that appeared to be a firearm in his waistband. So the fact that it was purchased by Ms. Lang the day after his birthday, the fact that it was used in the October 2024

1  shooting where no female was seen, and someone matching
2  Mr. Waide's description was, the fact that it was later
3  found in the place where he resides 50 percent of the time.
4  And then we're focusing exclusively on the firearm, and
5  there was ammunition throughout the home, to include one
6  round in his own child's bedroom, ammunition in the laundry
7  room, a magazine full of ammunition in a drawer in his room
8  that he shared with Ms. Lang.
9      We charged in the complaint possession by Mr. Waide
10  from October 2024, through April 25, 2025, based off of his
11  use of that firearm in October and its presence in his house
12  in April.  I think we have established that at some point in
13  that nearly six-month period that he possessed that firearm,
14  and in fact used it.
15      THE COURT:  Remind me, Special Agent Robison
16  testified about some of the ammunition types.  I can't
17  remember if it was under cross by Ms. Lawson, about how they
18  tied up to some of the prior activities.  Am I incorrect in
19  that, Ms. Melton; can you remind me of that?
20      MS. MELTON:  I don't think I understood your
21  question, Your Honor.
22      THE COURT:  Certainly.  The types of ammunition
23  that were found at the residence, there was some reference,
24  I thought.  I could be wrong.  I'm asking for clarification,
25  and Ms. Lawson can jump in if I'm wrong, 'cause I certainly

1  could 'cause there's a lot of information, and I've got

2  notes all over the place here, that the ammunition that was

3  found at the residence in terms of the caliber or type, I

4  believe Agent Robison indicated may be tied to some of the

5  prior activities.  Can you refresh my recollection as to

6  that?

7        MS. MELTON:  The ammunition found in the

8  residence, I believe there was nine millimeter, .40 and .45

9  caliber located.  So some of that could have been used for

10 the Glock that was actually found in the residence.

11       The Lewis homicide certainly involved nine millimeter

12 and .40 caliber ammunition.  But at this point, there's not

13 been any type of testing, and I'm not even sure that testing

14 is possible to determine if, you know, that was the same

15 ammunition that was used in the Lewis homicide admittedly,

16 because even if there was a match for the, you know, company

17 that had manufactured it, I'm not sure that they can really

18 drill down, but --

19       THE COURT:  I'm not suggesting that.  I'm just

20 trying to understand the type and where we are.

21       Ms. Lawson, do you want to chime in here?

22       MS. LAWSON:  Just to clarify, Your Honor.  I think

23 he testified as to shell casings that were found in the

24 Cruze.  That's what I asked him about.

25       THE COURT:  Right, the ballistics?

1          MS. LAWSON:  Yeah.

2          THE COURT:  Yeah.

3          MS. LAWSON:  Which he specified that there was,

4    you know, essentially like preliminarily testing that had

5    been done.  But there had been no final testing to

6    absolutely verify that those shell casings were -- could be

7    tied to that firearm.

8          THE COURT:  Understood.

9       So, Counsel, we've been at this for about an hour and

10   40.  I've got a lot of information.  What I'd like to do is

11   take a quick recess, just kind of gather my thoughts, and

12   then again to the extent that I do find whether or not I do

13   find the United States's probable cause, we would turn to

14   the detention issue.  So this can serve as a couple bases.

15   One's to recess for me to just gather and look at my notes,

16   and two, take a pause before if we have to move onto the

17   second part of this hearing.

18      So I'm going to take ten minutes, maybe an eight-minute

19   recess here and we'll get restarted then.

20      So we'll be in recess here for just a few minutes.

21          (Recess - 3:42:04 - 3:54:01 p.m.)

22          (In open court)

23          THE COURT:  All right.  We are back on the record.

24   Counsel for the United States as well as the defendant are

25   both here in court.

1       The issue, of course, is the issue of probable cause

2   here to the relevant charges 922(g)(9), of course.  I don't

3   think that Ms. Lawson is arguing that there isn't a domestic

4   violence conviction relevant to trigger the 922(g)(9)

5   analysis here.  Really, this becomes an issue of possession

6   and how all that plays out relevant to the events in the

7   execution of the search warrant here at issue.

8       Generally, Mr. Waide, what I'm looking for here are

9   facts and circumstances that will suggest that this crime

10  was committed and it was committed by you.  Again, this is

11  relatively a low burden.  The United States has got to meet

12  this burden.  And I will say, this is, this is a closer call

13  than most that we typically see, but I do think the United

14  States has met it.  Let me walk you through why I think

15  that.

16      I understand Ms. Lawson's point, and certainly that's

17  what I was focused in on as I sit up here.  I had the

18  decision from the Sixth Circuit of the *United States V.*

19  *Latimer* and *United States V. Johnson*.  I know that means

20  nothing to you, but it'll mean something to Ms. Lawson.

21      But *Latimer* is kind of the leading decision in the

22  Sixth Circuit as to constructive possession usually in the

23  922(g) context, and the *United States V. Johnson's* decision

24  from the Sixth Circuit just a couple of months ago about

25  this same issue, and in various similar circumstances.

1          So for example, in *Latimer* and *Johnson*, they talk about

2    the definition of constructive possession occurs when an

3    individual knowingly has the power of intention at a given

4    time to exercise dominion and control over a firearm either

5    directly or through others.

6          In both *Latimer* and *Johnson*, the argument was that they

7    were in a residence with their partner in both defendants

8    were claimed that they believed to the extent that there is

9    any kind of possession ownership, it goes to the partner and

10   not them, right?  So very similar circumstances to what we

11   have here, is that the argument is that you didn't have any

12   possession, that to the extent there was possession, it was

13   through your partner in that she had the possession.  And

14   certainly, she claimed ownership as to the firearm itself.

15         But it talks about here under the Sixth Circuit,

16   Constructive possession in a jointly occupied home can be

17   demonstrated through minimal purely circumstantial evidence

18   connecting one occupant to the contraband.

19         Indeed, in *Latimer* involved the constructive possession

20   of firearms found in plain view, and in a bedroom steps away

21   from another bedroom which contained the defendant's

22   clothing and personal belongings.

23         Looking -- taking that framework and turning it over to

24   this case and looking at what was found here, certainly, I

25   think the United States has probable cause is relevant to

1    the ammunition that was found throughout the house.

2        I understand the specificity issue that Ms. Lawson

3    raises, but again, finding the ammunition throughout the

4    house certainly poses some issues relevant to possession and

5    the concern of possession and the fact that it would

6    indicate access by you to that ammunition.

7        Of course, the Sixth Circuit's going to require a

8    quantum bit more of evidence relevant to *Latimer* and *Johnson*

9    and these other decisions.  I think the United States has

10   this through some of the prior circumstantial evidence, the

11   prior activities.

12       Certainly relevant to the October 24 driving and

13   shooting, and certainly as they approached the scene that

14   there was this object that was in your waistband, which I

15   know they can't confirm was a firearm.  But all in all, this

16   establishes circumstantial evidence that's which is needed

17   here, that quantum more of evidence that would suggest

18   constructive possession under the Sixth Circuit's framework

19   and would get the United States past probable cause in that

20   low burden here to establish the 922(g)(9) charge as the

21   United States has set forth in the criminal complaint.

22       And so with that finding, the Court will bind the

23   matter over to the grand jury for the grand jury's further

24   consideration.

25       Of course, that does not resolve the government's

motion for pretrial detention, which the Court found the

government can make that motion under 3142(f)(1)(E).  This

is not a presumption case.

    And so, Ms. Melton, I start with you.  Has the United

States had a chance to review the pretrial service report in

this matter?

            MS. MELTON:  I have, Your Honor.

            THE COURT:  Okay.  And is -- so this is my usual

three questions, Ms. Melton.

    Is the United States still seeking detention in this

matter?

            MS. MELTON:  We are.

            THE COURT:  Any victims to be heard from as part

of this proceeding?

            MS. MELTON:  No, Your Honor.

            THE COURT:  Ms. Lawson, have you had a chance to

review the pretrial service report in this matter with

Mr. Waide?

            MS. LAWSON:  I have, Your Honor.

            THE COURT:  Any edits or corrections we need to

note before we get started?

            MS. LAWSON:  No, Your Honor.

            THE COURT:  Is your client still seeking release?

            MS. LAWSON:  Yes.

            THE COURT:  All right, then.  Given this as a

1  non-presumption case, then, Ms. Melton, we're back to you

2  leading the charge here as to the burden.  Witnesses or

3  proffer of fact?  You may not have any.  You may certainly

4  rely on the testimony, I know both sides offered before this

5  in the preliminary hearing.  I thought I'd ask, witnesses or

6  proffer of fact on the issue of detention here?

7          MS. MELTON:  No further witnesses, just argument,

8  Your Honor.

9          THE COURT:  Certainly.

10      Ms. Lawson, any kind of witness or proffer of fact

11  further than what we've heard before?

12          MS. LAWSON:  No, Your Honor.

13          THE COURT:  All right.  Simple enough then.  We'll

14  turn to the arguments.

15      Ms. Melton, I'll start with you under the 3142(g)

16  factors.  What is the United States' position here?

17          MS. MELTON:  Starting with (g)(1), Your Honor,

18  this is an offense that involves a firearm.  The United

19  States already walked through its weight of the evidence

20  arguments with respect to probable cause before, and we

21  would rely on those same arguments here.

22      But the most important factors here are probably

23  Mr. Waide's history and character and the danger to the

24  community.  Mr. Waide's criminal history really

25  under-represents his dangerousness.

1    We saw a video from two different incidents today that

2  looked like they were scenes from Baghdad in 2004, not

3  residential areas of Lexington, Kentucky.  And Mr. Waide has

4  been a willing participant in all of them.  Mr. Waide, along

5  with the --

6           THE COURT:  Sorry, Ms. Melton, I have to

7  interrupt.  Do you think -- I'm not sure he's willing or he

8  wanted to be a participant then, especially in October in

9  the car shooting.  It looks like he's a victim of -- I

10  understand the circumstances of --

11           MS. MELTON:  Let me get there, Your Honor.

12           THE COURT:  Okay.  All right.

13           MS. MELTON:  I'm getting there.

14           THE COURT:  I don't know if all of this is true.

15  I'm just looking at the video.  Yeah.

16           MS. MELTON:  Right.  And he was on probation at

17  that time --

18           THE COURT:  Sure.

19           MS. MELTON:  -- and was nevertheless carrying when

20  he returned fire.

21           THE COURT:  That's a fair point.

22           MS. MELTON:  But Mr. Waide, who according to that

23  obituary, is Pooda's childhood best friend, along with the

24  other Hot Boyz, have wanted revenge for Pooda's death ever

25  since it happened, and have now been antagonizing the Sleet

1    family and the other East End gangs for years.

2         Mr. Waide appeared in a music video in which the Hot

3    Boyz actually brag about the murder of Malik Sleet.

4         And just side note, Malik Sleet actually was not

5    wrapped up in all of this.  He just happened to be related

6    to the wrong people.

7              THE COURT:  Okay.

8              MS. MELTON:  But they brag about it.  He's seen in

9    multiple photos over time, throwing up gang signs trying to

10   dis these people, in addition to bragging about the murder

11   of one of their family members.

12        So in October 2024, the shooting that we saw on the

13   video of here today occurred two days after the homicide of

14   Jadyn Sleet, another Sleet family member who had been

15   murdered.

16        So Mr. Waide has participated in this war.  That day he

17   happened to be the victim of an ambush, which is common in

18   wartime, but he is not an innocent bystander or victim in

19   all of this.

20             THE COURT:  Ms. Melton, I guess I'm just looking

21   for -- I understand the history of this.  Lord knows, I have

22   seen more cases than I want to care about between the Hot

23   Boyz and the East End group, and certainly have seen many

24   Sleets come before me and all the complications that come

25   with that family.  But I'm looking for what Mr. Waide's

1    direct involvement here is with a lot of these activities.

2          I understand the October 26, '24 driving issue.  But

3    all these other activities, I mean, it sounds like he's with

4    -- he has a lot of friends that are doing some really horrid

5    decision-making.  How can I put him really at the heart of

6    this though?

7          MS. MELTON:  Because he is also antagonizing the

8    Sleet family, along with his friends.  And we see him and

9    the East End gangs endangering the community in October

10   2024, and that's not a new thing for Mr. Waide either.

11         When he was shot in March 2020, he told a witness that

12   was tending to him after the shooting that he knew who did

13   it and that he was going to get them.  But he was totally

14   uncooperative with law enforcement, because again, he would

15   rather endanger the community by handling it himself than be

16   cooperative with law enforcement.

17         And then there's Mr. Waide's domestic violence

18   incident, problematic in itself.  According to the reports,

19   Mr. Waide pushed this woman with a child in her hands,

20   strangled her while the child was still in her hands, hit

21   her in the face while the child was still in her hands, and

22   then actually pushed them to the ground, causing the baby to

23   hit his head.  That is an incredibly violent incident.

24         But then last, but certainly not least, there was

25   Mr. Waide's involvement in the Lewis homicide.  And I know

1  that he's innocent until proven guilty.  Charges are

2  forthcoming on that, and we haven't even charged him yet,

3  but we're going to, and the evidence against the Hot Boyz is

4  overwhelming.

5      Mr. Sharp is linked to that homicide through shell

6  casings and through his vehicle and through a hat that was

7  found in the vehicle.

8      Mr. Dixon is seen right on top of Lewis's house right

9  on top of his workplace and actually sent Lewis's license

10 plate number in a group text the day before the homicide.

11     Meanwhile, Mr. Bellomy --

12         THE COURT:  Was Mr. Waide in that group text?

13         MS. MELTON:  He was not.

14         THE COURT:  Okay.

15         MS. MELTON:  Meanwhile, Mr. Bellomy is seen

16 directly outside of Mr. Lewis's house the day before the

17 homicide because a jealous girlfriend took a screenshot of

18 his location.  So there's overwhelming evidence that Sharp,

19 Dixon and Bellomy were involved in that incident.

20     And then we see messages relating to Mr. Waide the

21 night of the incident with him and Mr. Dixon in the same

22 location, and Dixon and Sharp are talking about payment from

23 quote, "The four of us," right after they got paid from

24 Rollie Lamar.  And when we look at Mr. Waide's historical

25 cell site location for that day, not only was he with

1    Mr. Dixon at the time of payment, he was active early that

2    morning near Tyrone Moss's house with William Dixon near

3    Warwick Drive and over by Centre Parkway where the Acura was

4    abandoned.

5        So we do feel that he is dangerous, he has fueled gang

6    violence, he's a domestic abuser, and he facilitated the

7    murder of a federal witness.

8            THE COURT:  Ms. Lawson.

9            MS. LAWSON:  As Your Honor is aware, the bond

10   report does in fact recommend conditions, but I do think

11   needs to be given very serious consideration by the Court.

12       As I suspect that the government's emphasis here is on

13   alleged conduct of Mr. Waide and his connections to

14   shootings and murders.  I think the most direct evidence we

15   have of his involvement in any of the incidents that the

16   Agent has testified here today is that he was in fact shot,

17   not one doing the shooting in 2020.

18       But there's a big -- there's a lot to do with this

19   October 2024 shooting.  But again, we've seen the video

20   where again, it was confirmed by the Agent's testimony that

21   four individuals got out of the silver sedan that was

22   closest to the video, but you never see anyone get out of

23   the Chevy Cruze, certainly not to return gunfire.

24       I don't know how exactly to describe how little

25   involvement they have proved of with Mr. Waide and all of

1  the incidents that they've been talking about.

2      As Your Honor said, it seems to me like he's got some

3  friends that are making very, very poor decisions.  And

4  Mr. Waide's probably not making the best decision by being

5  friends with them, being around them.  But certainly it does

6  not mean that he is involving himself in the conduct, their

7  criminal conduct.  I just do not believe that there's

8  evidence here, and certainly not to hold him pre-trial

9  detention up until he's indicted and this can be set for

10  trial.

11      He is agreeable to the conditions that have been listed

12  in the bond report.  The Court has heard confirmation from

13  Ms. Haddix, his mother, that he can in fact reside with her

14  full-time.

15      He's had employment that he's had for close to a year

16  now.  In speaking with Mr. Waide, he can't -- he does

17  believe he can return to that employment in the position

18  that he held if he is released.

19      And I know that there's been -- there is a condition of

20  monitoring, which again, I don't think he has any issue

21  with, as long as he's allowed to have work release so that

22  he can continue to remain employed while awaiting trial in

23  this matter.

24      So, Your Honor, I would ask that the Court give serious

25  consideration to those conditions to allow Mr. Waide to be

1  released pre-indictment and pre-trial in this matter.

2          THE COURT:  Ms. Lawson, let me ask you a couple

3  questions on the other side.  Of course, I gave Ms. Melton

4  some questions.

5      I mean, you can agree with me that when it comes to Hot

6  Boyz and 530, which again, I've seen so many of these cases

7  in the past three or four years now, that is a very

8  dangerous and very violent, volatile situation; would you

9  agree with me on that?

10          MS. LAWSON:  I would agree, Your Honor.

11          THE COURT:  And then I understand the lack of

12  connection, but we could agree, to the extent that there is

13  an established connection, which Ms. Melton is going to come

14  back and talk to me here in a second, but that is some

15  concerning conduct relevant to people involved, Mr. Bellomy,

16  Mr. Dixon, Mr. Sharp, and all those individuals; would you

17  agree to that?

18          MS. LAWSON:  I would agree.

19          THE COURT:  Okay.  Those are the questions I had.

20  Thank you.

21      Ms. Melton, back over to you.

22          MS. MELTON:  Was there anything specific you

23  wanted me to address, Your Honor?

24          THE COURT:  The floor's yours.

25          MS. MELTON:  Just counter?

1          THE COURT:  Counter.  The floor's yours.

2          MS. MELTON:  In terms of Mr. Waide living with

3   Ms. Haddix, he lived with Ms. Haddix, according to her, for

4   a lot of this time period.  He was also on probation for

5   much of this time period when he was throwing up gang signs

6   and bragging about knowing Sleet's murder in November 2023.

7      He was in possession of a firearm in October 2024.

8   Victim or not, he had it in the car with him and shot it.

9          THE COURT:  True.

10         MS. MELTON:  Shell casings were found inside the

11  car because he fired the firearm and the shell casings were

12  ejected into the car.  They were also found throughout the

13  scene.

14     So if Mr. Waide can't behave himself on probation after

15  a very serious incident, strangling his girlfriend and

16  getting a pretty light sentence, and his mother couldn't

17  guarantee his good conduct during the previous time that he

18  lived with her, I don't know what guarantees that we're

19  going to have of his good conduct moving forward.

20         THE COURT:  All right.  I appreciate the

21  arguments, Counsel.

22     Mr. Waide, here's what I'm going to do.  This was a lot

23  of information.  Obviously, the pretrial service report,

24  which we'll mark in the record under seal so that's there.

25  You don't have much criminal history, and probation's

1  recommending release.  But obviously, there was a lot more
2  information outside that bond report that was provided
3  today.
4       And you've heard, I made some comments trying to
5  understand the connection with those larger activities
6  relevant to 530 and Hot Boyz and where you fit in with those
7  overall issues, the Kristopher Lewis murder, Malik Sleet's
8  murder, a number of these issues, and I need to grapple with
9  that and think about that relevant to the factors that I
10 think about under the Bail Reform Act.
11      So here's what I'm going to do.  I'm going to take all
12 this under consideration.  I want to think about it for a
13 second.  I think I owe it to you not to just flippantly make
14 a decision one way or the other.  I think I owe it to the
15 United States not to make a decision flippantly one way or
16 the other.  I want to think about this.  I'm not going to
17 think about it for long.  I understand your liberty's at
18 stake.  That is something I take very seriously, and so I
19 intend to make a decision here very quickly, but I want some
20 time to think about it.
21      And so here in the next couple days, I'll either have a
22 hearing which I explain to you what the conditions over
23 which I'm willing to release you, or I'll issue a detailed
24 opinion in the next couple days explaining to you why I
25 think you should be detained under the statute.

1     Either way, you'll hear from me and you'll hear from me
2  soon.  But I just want some time to process this and weigh
3  all the various factors and how they should apply in this
4  case, given what I know and given what's been put in the
5  record.
6     In the interim until you hear from me, you'll remain in
7  the custody of the United States Marshals Service, but
8  again, I don't intend to sit on this decision very long.
9     Ms. Melton, other than that, anything further of the
10 United States as to this matter?
11          MS. MELTON:  No, Your Honor.  Thank you.
12          THE COURT:  Ms. Lawson?
13          MS. LAWSON:  Judge, I think the only last thing I
14 would -- and I should have said this, is I think a condition
15 after what we've heard today of no contact with named
16 individuals would be an appropriate way of addressing his
17 connection to those individuals to the fact that it's been
18 established here today.
19          THE COURT:  Certainly; that's a fair point.
20      All right.  Thank you, Ms. Lawson.
21      With that, we'll stand adjourned.  Thank you, everyone.
22          *(Proceedings adjourned at 4:12:16 p.m.)*
23                  * * * * *
24
25

1

2                    *C E R T I F I C A T E*

3        I,  Sandra L. Wilder, do hereby certify that the

4    foregoing is a true, correct and complete transcript of the

5    digitally-recorded proceedings in this matter, recorded on

6    May 27, 2025, and transcribed from the digital recording, to

7    the best of my ability to hear said recording, and that said

8    transcript has been compared with the digital recording.

9

10                    /s/ Sandra L. Wilder

11                    SANDRA L. WILDER, RMR, CRR,

12                    COURT REPORTER         Date:  06/27/2025

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              INDEX

3    GOVERNMENT WITNESS:

4
     ISAAC ROBISON
5        Direct Examination . . . . . . . . . . . Page   4
         Cross-examination. . . . . . . . . . . . Page  48
6        Redirect Examination . . . . . . . . . . Page  65

7

8                             EXHIBITS

9    GOVERNMENT EXHIBITS:

10   Government Exhibit Number 1 — Photo of the Hot Boyz
         Identified . . . . . . . . . . . . . . . Page   5
11       Admitted . . . . . . . . . . . . . . . . Page   6

12   Government Exhibit Number 2 — Obituary of Ja'Quis Ray
         Identified . . . . . . . . . . . . . . . Page   9
13       Admitted . . . . . . . . . . . . . . . . Page  10

14   Government Exhibit Number 3 — Snapchat Messages
         Identified . . . . . . . . . . . . . . . Page  13
15       Admitted . . . . . . . . . . . . . . . . Page  14

16   Government Exhibit Number 4 — Screenshot from Music Video
     "Hats"
17       Identified . . . . . . . . . . . . . . . Page  18
         Admitted . . . . . . . . . . . . . . . . Page  18
18
     Government Exhibit Number 5 — Dash Camera Video of Shooting
19       Identified . . . . . . . . . . . . . . . Page  21
         Admitted . . . . . . . . . . . . . . . . Page  22
20
     Government Exhibit Number 6 — Doorbell Camera Video with
21   Audible Gunshots and High Speed Chase (Patchen Drive)
         Identified . . . . . . . . . . . . . . . Page  23
22       Admitted . . . . . . . . . . . . . . . . Page  23

23   Government Exhibit Number 7 — Doorbell Camera Video with
     Audible Gunshots and High Speed Chase (Patchen Drive)
24       Identified . . . . . . . . . . . . . . . Page  24
         Admitted . . . . . . . . . . . . . . . . Page  24

25

1

2    GOVERNMENT EXHIBITS:   (Cont.)

3
     Government Exhibit Number 8 - Photo of Gun inside HVAC
4    Vent
        Identified . . . . . . . . . . . . . . . Page 29
5       Admitted . . . . . . . . . . . . . . . . Page 30

6    Government Exhibit Number 9 - Dashboard Camera with Audio
     from Work Van
7       Identified . . . . . . . . . . . . . . . Page 36
        Admitted . . . . . . . . . . . . . . . . Page 37
8
     Government Exhibit Number 10 - Text Messages from William
9    Dixon's cellphone
        Identified . . . . . . . . . . . . . . . Page 45
10      Admitted . . . . . . . . . . . . . . . . Page 45

11
                              - - -
12

13

14

15

16

17

18

19

20

21

22

23

24

25